433 So.2d 688 (1983)
STATE of Louisiana
v.
Jessie Lee SMITH.
No. 82-KA-0924.
Supreme Court of Louisiana.
May 23, 1983.
*690 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Jr., Dist. Atty., A.L. Blondeau, Asst. Dist. Atty., for plaintiff-appellee.
Barry G. Feazel, Walker, Feazel & Tooke, Shreveport, for defendant-appellant.
BLANCHE, Justice.
Defendant Jessie Lee Smith was convicted of armed robbery, a violation of LSA-R.S. 14:64, and sentenced to 60 years at hard labor without benefit of parole, probation, or suspension of sentence. In appealing his conviction and sentence, he urges five arguments encompassing twelve assignments of error. We affirm.
On January 28, 1980, at approximately 12:15 p.m., a woman and two men entered the First State Bank of Plain Dealing, Louisiana, a small community north of Shreveport near the Arkansas border. The woman purchased a $100 money order. Then, armed with an array of pistols and a sawed-off shotgun, the three robbed the bank of close to $100,000, verbally and physically abusing several employees. Two shots were fired in the ensuing confusion, but no one was injured. The defendant, armed with a .45 caliber "machine gun-like" automatic rifle, waited outside with the getaway car, a two-door Chevrolet Nova bearing Texas license plate UPE 519.
Subsequent investigation unraveled the following scenario: The three persons who entered the bank were Leroy Jackson, Tony Smith ("Po' Red," the defendant's brother), and Marie Terrell ("Sugar Mama"). A week prior to the robbery, Jackson and his girlfriend, Mary Ann Crockett, had checked into the Jo-Dan Motel in Shreveport under fictitious names. They were driving a green and white Dodge van bearing Arkansas license plate HPH 298. At the same time, Tony Smith and Sugar Mama had checked into Sandy's Motel in Magnolia, Arkansas, a small town not far from Plain Dealing. Shortly thereafter, the defendant and his girlfriend, Betty Lou Wright, drove to the bank in his yellow Cadillac Seville. *691 Betty was sent inside with instructions to "case" the bank for the presence of cameras and the location of the vault.
On the morning of the robbery, the defendant and Jonah Cooper borrowed from the defendant's sister the Nova used as the getaway car. At a pre-arranged location in a patch of woods near Plain Dealing, these two met with Jackson, Smith, Sugar Mama, and Crockett, where the Texas plate UPE 519, stolen from a car in Houston, was placed on the Nova. Cooper and Crockett remained behind with the Dodge van and Cadillac Seville. After the robbery, the four perpetrators returned to the place and all left for Houston, where the defendant resided. The money was divided up at the defendant's apartment.

ARGUMENT NO. I

(Assignments of Error Nos. 1, 6, 7, 8, 9)
By these assignments, the defendant argues that the trial court erred in denying his motion to suppress certain items of evidence because the arresting officers had no probable cause for his arrest and because the alleged consent of his wife to search their apartment had not been given freely and voluntarily.[1] Specifically, the defendant sought to suppress, inter alia, the following items: a sawed-off shotgun, a black leather jacket with a roll of 86 one dollar bills in the pocket, $930 from a nightstand in his bedroom, another $930 from a purse in a closet, a beige travel bag containing $13,335, much of which was still bundled in First State Bank of Plain Dealing money wrappers, a .45 caliber automatic rifle, and the $100 First State Bank money order purchased by Sugar Mama (found in a photo album in the defendant's apartment).
Pursuant to their investigation of the incident, Officers Breedlove and Deen of the Bossier Parish Sheriff's Department learned that Texas license plate UPE 519 was registered to a J.D. Crooks of Houston for a 1968 Buick. The officers learned the names of Leroy Jackson, the defendant, and Tony Smith from an investigator in Magnolia, Arkansas who felt that the robbery in Plain Dealing was very similar to a bank robbery committed previously in Bernice, Louisiana which he had suspected those men of perpetrating. The investigator told the officers that the Smith brothers drove "expensive type vehicles," like a silver Chevrolet Corvette, a maroon Cadillac, a yellow Cadillac Seville, and a green and white Dodge van.
Further investigation revealed that a green and white Dodge van had been parked at the Jo-Dan Motel in Shreveport for the entire week prior to the robbery. It was also discovered that a maroon Cadillac frequented the motel during that week, often parking beside the Dodge van. In checking the registration of the van, the officers discovered that it was registered to the defendant, Jessie Smith. Jackson and Crockett had checked out of the motel on January 28, 1980, the day of the robbery.
The officers discovered an ex-girlfriend of Leroy Jackson in Magnolia, Arkansas. She had worked for Jackson as a prostitute and supplied the officers with photographs of all of the suspects. Using the photographs, the officers prepared a photographic lineup for Jackson, and the employees of the bank chose him as one of the robbers. The officers then obtained an arrest warrant for Leroy Jackson.
On February 4, 1980, about one week after the robbery, Officers Deen and Hernandez went to Houston to photograph the 1968 Buick from which Texas plate UPE 519 had been stolen. The officers had learned from J.D. Crooks that he had sold the Buick to his son who resided in the Wilchester Apartments. While at the apartment complex photographing the Buick, they discovered the green and white *692 Dodge van and the maroon Cadillac parked nearby. Deen and Hernandez then approached the manager of the apartment complex with a photographic lineup containing all of the suspects. She selected a photograph of the defendant and advised them that he resided in Apartment 130 and owned several vehicles in the parking lot, including a silver Corvette. She also selected Leroy Jackson's photograph and said that he was a close associate of the defendant who frequented his apartment.
Based on this information, the officers, in conjunction with the Houston Organized Crime Unit, set up a surveillance of the parking lot. At about 7:10 p.m., the defendant drove into the lot in a silver Corvette and parked near the other vehicles. As he exited his car, he was approached by Houston police officers and advised that he was under investigation for the Louisiana bank robbery.
After a few moments, the defendant stated that he was cold and wanted his coat out of the car. One of the officers reached in for the black leather jacket and noticed a sawed-off shotgun lying beneath it on the flat cargo area behind the front seat.[2] As a precaution, the officer patted down the jacket before handing it to the defendant. Feeling a large bulge in one of the pockets, the officer removed a wad of 86 one dollar bills. The defendant immediately threw up his hands and said, "That's not my money. Don't try to plant that on me." The shotgun proved to be loaded with five rounds of buckshot, and the defendant was arrested and advised of his Miranda rights.
In interpreting the constitutional guarantees against unreasonable searches and seizures, two principles have evolved: before a police officer may make an investigatory stop, he must reasonably suspect that the person has committed or is about to commit a criminal offense, and before a police officer may arrest a person without a warrant, he must have probable cause to believe that the person has committed a criminal offense. State v. Davis, 359 So.2d 986 (La. 1978).
Probable cause for an arrest exists when the facts and circumstances known to the officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. La.C.Cr.P. art. 213; State v. Arceneaux, 425 So.2d 740 (La.1983); see Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); cf. Tex.C.Cr.P. art. 1.06; Brown v. State, 630 S.W.2d 322 (Tex. Cr.App.1982); Brewster v. State, 606 S.W.2d 325 (Tex.Cr.App.1980). Reasonable cause for an investigatory stop is something less than probable cause to arrest, but requires that the police have sufficient knowledge of the totality of facts and circumstances to justify an infringement of an individual's right to be free of governmental interference. La.C.Cr.P. art. 215.1; State v. Chaney, 423 So.2d 1092 (La.1982); State v. Rodriguez, 396 So.2d 1312 (La. 1981); cf. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Ebarb v. State, 598 S.W.2d 842 (Tex.Cr.App.1979); Christian v. State, 592 S.W.2d 625 (Tex.Cr. App.1979), cert. denied, 446 U.S. 984, 100 S.Ct. 2966, 64 L.Ed.2d 841 (1980). In our opinion, the police officers were justified in conducting an investigatory stop of the defendant; furthermore, based on the totality of the circumstances presented by these facts, probable cause existed for his arrest.
Prior to the stop of the defendant, the officers had obtained considerable information linking the defendant to the Plain Dealing robbery: the Texas license plate missing from a 1968 Buick owned by a resident of the Houston apartment complex where the defendant resided; the green and white Dodge van registered to the defendant (and which had been seen at the Jo-Dan Motel where co-perpetrator Leroy Jackson had been staying immediately prior to the robbery) was sighted in the parking lot of the Houston apartment complex *693 where the defendant resided; the maroon Cadillac seen at the Jo-Dan Motel was parked next to the Dodge van at the Houston apartment complex; information from a Magnolia, Arkansas investigator that the defendant owned a green and white Dodge van, a maroon Cadillac, a silver Corvette, and various other vehicles; a photographic identification of the defendant by the apartment manager and information that he owned a number of vehicles in the parking lot, including a silver Corvette; a photographic identification by the manager of Leroy Jackson, for whom the officers held a valid arrest warrant, as a "close associate" of the defendant who frequented his apartment; the defendant eventually drove into the parking lot in a silver Corvette.
Clearly, the above facts supplied reasonable cause for an investigatory stop of the defendant. Moreover, the officer was justified in patting down the defendant's jacket for the presence of weapons. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). These facts, coupled with the discovery of the loaded sawed-off shotgun in the defendant's car, were sufficient to justify a man of "ordinary caution" in believing that the defendant had committed a crime. Since probable cause existed for the arrest, the $86, the black leather jacket, and the shotgun were admissible into evidence.[3]
Following the arrest, the defendant was handcuffed and placed in a marked police cruiser, whereupon he was driven to police headquarters for processing. Hoping that some of the other co-perpetrators might show up, particularly Leroy Jackson, the officers continued their surveillance of the parking lot until approximately 10:00 p.m. When no other suspects appeared, the officers went to the defendant's apartment and advised the defendant's wife that her husband had been placed under arrest for the Louisiana bank robbery. They also advised her that they held an arrest warrant for Leroy Jackson. Mrs. Smith admitted the officers but denied that Jackson was in the apartment. After a cursory walk-through to ensure that no one was hiding in one of the other rooms, the officers explained that they wanted to search the premises and explained to her three options: she could give her oral consent, sign a written consent to search form, or request that the officers leave and obtain a search warrant. Mrs. Smith signed a written consent to search form, and the items now sought to be suppressed were discovered in the ensuing search.
A valid consent search is a well-recognized exception to the warrant requirement, but the burden is upon the state to prove that the consent was given freely and voluntarily. Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case. The factual determinations of the trial judge are given great weight on appellate review. State v. Ludwig, 423 So.2d 1073 (La.1982); State v. Yarbrough, 418 So.2d 503 (La.1982); State v. Wolfe, 398 So.2d 1117 (La.1981). We are of the opinion that the trial judge analyzed properly the totality of the circumstances in this case and determined properly that Mrs. Smith's consent had been given freely and voluntarily.
All of the officers present testified that the encounter with Mrs. Smith was cordial and calm. Officer Deen testified as follows:

* * * * * *
"[S]he appeared to be veryvery calm and collected and was not crying or upset at any time. She appeared to be a very intelligent lady. [She] allowed us to sit down at her kitchen table .... [W]e *694 talked to her and asked her about the whereabouts of Leroy Jackson. We showed her the warrants we had. We told her that her husband was in custody.
* * * * * *
So we talked to [Mrs.] Smith about the ways she could waive her rights of her apartment and could allow us to [search]. We told her that we could allow her to give an oral consent, we told her we could get a written consent, or we told her we could get a search warrant. [T]hese various ways were explained to her and she said ... she would rather go ahead and get it over with [so] we could go ahead and leave."

* * * * * *
According to the testimony of the officers, Mrs. Smith had begun to explain how the defendant had brought home "large stacks of money" and wanted to show the officers where it was located. The officers then cautioned Mrs. Smith on her right to refuse the search and explained to her the three options. The officers expressly denied threatening to "tear things up" had they been required to obtain a search warrant. Furthermore, it was a full twenty minutes before a form was obtained for Mrs. Smith's signature, ample time for her to reconsider her decision, and the officers testified that she read the form carefully for several minutes before signing.
On the other hand, Mrs. Smith testified that the officers threatened to search the apartment "one way or the other" and that they would "tear things up" if they were required to obtain a warrant. However, her testimony on cross-examination was very inconsistent, particularly in regard to her husband's employment history and how they had obtained so many expensive vehiclesall paid for with cash. She was very evasive in identifying the items seized from the apartment and in characterizing the extent of her acquaintance with Leroy Jackson, Tony Smith, and "Sugar Mama".
Based on our review of the record, we cannot say that the trial court abused its great discretion in determining that Mrs. Smith's consent had been given freely and voluntarily. Faced with a weighing of respective credibilities in light of the evasive and inconsistent testimony of Mrs. Smith, we cannot say that the trial court erred in finding the testimony of the police officers more credible.
For these reasons, these assignments are without merit.

ARGUMENT NO. II

(Assignment of Error No. 2)
By this assignment, the defendant argues that the trial court erred in refusing to grant his motion for mistrial for an alleged impermissible reference by the state to "another crime" perpetrated by the defendant. Additionally, the defendant urges that the testimony of Betty Lou Wright that the defendant "shot a gun off in the woods" was also an impermissible reference to another crime.
This assignment of error arose in the following context: Betty Lou Wright, the defendant's former girlfriend, was testifying as a witness for the state and described how she had advised friends to conceal her whereabouts from the defendant since she feared involvement in any of his criminal activities:

* * * * * *
"Q: Why did you tell her that?
A: Because I had figured outI had figured out everything about what was going to come down and I didn't want to be involved.
Q: How had you figured out what was coming down?
A: By listening to conversations and the way everything was acting.
Q: What kind of conversations?
A: Like
[Counsel for defendant]: Well, I'm going to object to any conversations unless they are an exception to the hearsay rule.
[Prosecutor]: Your Honor, I believe we have adequately shown a conspiracy in this matter, and of course, any statements of the defendant or the co-conspirators are an exception to the hearsay rule *695 and they are admissible under the laws of this state."

* * * * * *
Outside of the presence of the jury, the defendant moved for a mistrial. The trial judge refused to grant the motion but admonished the jury to disregard any reference by the state to a conspiracy. The state abandoned the line of questioning.
La.C.Cr.P. art. 770 provides:
"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;..."
* * * * * *
The defendant has relied heavily on State v. Brown, 398 So.2d 1381 (La.1980) in urging that the trial court denied improperly his motion for a mistrial. In Brown, the defendant objected to, inter alia, the trial court's instruction to the jury concerning conspiracy since he had not been formally charged with the crime and urged that the instruction constituted an impermissible reference to "another crime" within the meaning of art. 770. We held that the jury may be charged with the law of conspiracy where the evidence adduced by the state establishes a prima facie case of conspiracy, even though the defendant may not have been formally charged with the crime. Id. at 1385.
We find Brown generally inapposite to the instant case. Here, the only reference to a "conspiracy" came in the prosecutor's brief response to a hearsay objection urged by the defendant in an attempt to explain the co-conspirator exception to the hearsay rule. The state abandoned the line of questioning, and no further attempt was made to either refer to or establish a conspiracy. Moreover, the trial judge did not instruct the jury on the law of conspiracy at the conclusion of the trial, nor was the defendant convicted of the crime of conspiracy. In our view, this brief mention of the word "conspiracy" was not an impermissible reference to another crime within the meaning of art. 770, and any prejudice to the defendant which may have resulted from the reference was cured by the admonition of the trial judge. See La.C.Cr.P. art. 771.
As to the testimonial reference that the defendant "shot a gun off in the woods," our review of the record shows that the defendant neither objected to the reference nor argued the statement in his motion for mistrial concerning the conspiracy reference. Failure to enter a timely objection or a timely motion for mistrial constitutes a waiver of the objection. State v. Motton, 395 So.2d 1337 (La.1981), cert. denied, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139; State v. Williams, 383 So.2d 996 (La. 1979); State v. Morgan, 367 So.2d 779 (La.1979).
This assignment is without merit.

ARGUMENT NO. III

(Assignments of Error Nos. 3, 4, 5)
By these assignments, the defendant argues that the trial court erred in denying his motion for a mistrial under La.C.Cr.P. art. 775 because of a testimonial reference to a sawed-off shotgun which had been excluded from evidence. Specifically, he urges that the reference was so prejudicial that it became impossible for him to obtain a fair trial.
This assignment of error arose in the following context: Jonah Cooper testified that Leroy Jackson had been armed with a .38 caliber pistol and sawed-off shotgun at the meeting place in the woods immediately prior to the robbery. Cooper testified that Jackson had put the shotgun in the Chevrolet Nova which was driven by the defendant to the bank. The shotgun, marked as state exhibit 20, was displayed to Cooper, who identified it as the weapon he had seen Jackson with prior to the robbery. Cooper testified further that Jackson removed the *696 weapon from the Nova after the robbery and placed it in the Dodge van. Subsequently, the state sought to introduce the shotgun into evidence. The defendant objected to introduction of the weapon as irrelevant, since there was no evidence that the defendant himself had used the shotgun during the robbery. The objection was sustained by the trial court.
The next witness was Officer Breedlove, who testified as to the circumstances surrounding the defendant's arrest in Houston. Without knowing that the shotgun had been excluded from evidence, Breedlove stated:
* * * * * *
"A: [H]e was arrested by the Houston Organized Crime Unit; at the time of his arrest, of course, that sawed-off shotgun was obtained and also 86 one dollar bills that was on his possession that was recovered."
* * * * * *
The defendant moved immediately for a mistrial on the basis of this "prejudicial reference" to the shotgun which had been excluded from evidence. The trial court refused to grant a mistrial but admonished the jury to disregard the reference to the shotgun.
La.C.Cr.P. art. 775 provides, in pertinent part:

* * * * * *
"Upon motion of a defendant, a mistrial shall be ordered ... when prejudicial conduct [inside] the courtroom makes it impossible for the defendant to obtain a fair trial ...."
* * * * * *
The determination as to whether a mistrial should be granted under this provision is within the sound discretion of the trial judge, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. State v. Alexander, 351 So.2d 505 (La.1977); State v. Haynes, 339 So.2d 328 (La.1976). The motion should be granted only where the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. State v. Cushenberry, 407 So.2d 700 (La.1981); State v. Goods, 403 So.2d 1205 (La.1981); State v. Sepulvado, 359 So.2d 137 (La. 1978). Brief, unsolicited references by witnesses to evidence previously suppressed do not necessarily give rise to such grave prejudice that a mistrial is mandated. State v. Giovanni, 409 So.2d 593 (La.1981); State v. Hammontree, 363 So.2d 1364 (La.1978).
In our opinion, the reference by Officer Breedlove to the shotgun did not result in any prejudice to the defendant substantial enough to warrant the drastic remedy of mistrial. The jury had already seen the shotgun during the questioning of Jonah Cooper, and, at the time of his reference to the shotgun, Officer Breedlove, who had been under a rule of sequestration with other witnesses, was unaware that the shotgun had been excluded from evidence on relevancy grounds. Indeed, the state had been afforded no opportunity to confer with Breedlove and advise him that the shotgun was not in evidence. Under such circumstances, the admonition of the trial judge to disregard any reference to the shotgun was sufficient to cure any prejudice which may have arisen from the reference, and the trial court did not abuse its great discretion in refusing to grant a mistrial.
These assignments are without merit.

ARGUMENT NO. IV

(Assignments of Error Nos. 10, 11)
By these assignments, the defendant argues that the trial court erred in failing to grant his motion for a mistrial under La.C.Cr.P. art. 770(3) because of alleged references by the state in closing argument to his failure to testify in his own behalf or to call witnesses on his own behalf. Specifically, the defendant urges that the following passages from the state's closing argument indirectly referred to his failure to testify or present evidence in his defense:

* * * * * *

*697 "Now, after the bank is robbed they run outside carrying money bags, you remember. Jessie Lee Smith, according to all of the witnesses, of course, the only one testified was Leroy as far as what actually happened in the bank, as far as the criminals themselves were concerned, Leroy said that Jessie is outout in the car waiting.
* * * * * *
[H]ave you see any evidence that will give you any reasonable doubt as to who that money got in Jessie's apartment, in Jessie's suit bag. Have you heard any evidence whatsoever as to how that money got in there if it wasn't the way that everybody said it was, because of the bank robbery? In Jessie's suit bag? How about the money that got in his wife's purse, bait money? Have you heard any evidence, any testimony, any reasonable testimony that will give you some reasonable doubt as to how that money got in that purse. I'll tell you how it got in the purse, he stole the money and he got his share and he gave some of the money to his wife. That's how it got in there. Did Leroy Jackson, I mean Leroy King, the sixteen year old boy, come in here and give you an explanation. He was there. Did he come in here and tell you no, they never brought him that money, or no, I didn't put that money order in the album. How about Jessie's sisters from Magnolia, did they come up here and testify and tell you that he didn'the didn't take the car that morning. I mean these are his sisters.
Don't you think if they could say they would have taken the stand and said it. Did they come here and say no Jessie didn't come and get my car and drive it to Magnolia, and no Jonah didn't call me the next morning and say myyour brother committed an armed robbery and come get your car. You don't think they would have called them to testify ifif that had been the case. They didn't contradict any of Jonah's story. Was there any testimony of witnesses placing this defendant any other place other than being in Magnolia and at the Bank of First State Bank of Plain Dealing at the time of the robbery? No."
* * * * * *
La.C.Cr.P. art. 770 provides, in pertinent part:
"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(3) The failure of the defendant to testify in his own defense;"

* * * * * *
In order to mandate a mistrial under this provision, the alleged indirect reference must be intended to draw the attention of the jury to the defendant's failure to testify or present evidence in his behalf. State v. Johnson, 426 So.2d 95 (La.1983); State v. Stephenson, 412 So.2d 553 (La.1982); State v. Curry, 390 So.2d 506 (La.1980).
In our view, the prosecutor's comments were directed to the lack of evidence in the defendant's behalf. Where the defendant himself is not the only witness who might take the stand to refute the state's case, argument to the jury that the state's presentation of the facts is uncontroverted does not focus the jury's attention on the defendant's failure to testify. State v. Latin, 412 So.2d 1357 (La.1982); State v. Perkins, 374 So.2d 1234 (La.1979). There were many witnesses upon whom the defendant could have called to refute the state's case, and the prosecutor's argument focused principally on the uncontroverted nature of the state's presentation of the facts. Even if we were to assume, arguendo, that the state's argument referred obliquely to the defendant's failure to testify, we do not find it plain from the record that the references, if any, were intended to focus the jury's attention on the defendant's failure to testify or present evidence in his behalf. State v. Johnson, supra; cf. State v. Kersey, 406 So.2d 555 (La.1981); State v. Bodley, 394 So.2d 584 (La.1981); *698 State v. Culberth, 390 So.2d 847 (La.1980); State v. Albert, 381 So.2d 424 (La.1980); State v. Valentine, 375 So.2d 1378 (La.1979).
These assignments are without merit.

ARGUMENT V

(Assignment of Error No. 5)
By this assignment, the defendant urges that the 60 year sentence without benefit of parole, probation, or suspension of sentence is unconstitutionally excessive, especially since he only drove the getaway car and his accomplices who actually entered the bank received more lenient sentences.[4]
Under LSA-R.S. 14:64(B), the defendant could have been sentenced to as many as 99 years without benefit of parole, probation, or suspension of sentence. However, even sentences within statutory limits may be reviewed for excessiveness. La. Const. art. 1, § 20; art. 5, § 5; State v. Parish, 429 So.2d 442 (La.1983). Intertwined with our review of a sentence for excessiveness is our review of the record to ensure that the trial court complied adequately with La.C.Cr.P. art. 894.1 and accorded proper weight to all relevant sentencing factors. State v. Tompkins, 429 So.2d 1385 (La.1983).
While the trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant. State v. Ray, 423 So.2d 1116 (La.1982); State v. Keeney, 422 So.2d 1144 (La.1982); State v. Duncan, 420 So.2d 1105 (La.1982). A sentence will be deemed excessive where it is "grossly out of proportion to the severity of the crime," or where it is "nothing more than the purposeless and needless imposition of pain and suffering." State v. Bonanno, 384 So.2d 355 (La.1980). While co-defendants convicted of the same crime need not be sentenced equally, even where the co-defendants come from similar backgrounds and might be similar in other respects, disparity of sentences is another of the factors to be weighed by this court in assessing an excessiveness claim. State v. Quimby, 419 So.2d 951 (La.1982); State v. Rogers, 405 So.2d 829 (La.1981). After carefully reviewing the record, we are of the view that the trial court gave proper consideration to all sentencing factors; accordingly, we do not find the defendant's sentence unconstitutionally excessive.
In this case, there exists a clear justification for the disparity in sentences. The great bulk of the evidence adduced at trial established the defendant as the leader of this criminal venture, the gravitational center around which revolved the planning and execution of this robbery. After the robbery had been completed, the perpetrators gathered at the defendant's Houston apartment to divide up their ill-gotten booty, fleeing the State of Louisiana in vehicles registered to the defendant. The getaway car had been procured by the defendant from his sister. The Texas license plate had been stolen from a car in the parking lot of the defendant's apartment complex.
As noted by the trial judge in his sentencing colloquy, the robbery was well-planned and all participants were "well-drilled" in their respective duties. The defendant's conduct threatened serious harm to the victims; there were verbal threats, profanity and physical abuse of the victims. All perpetrators were armed and shots were fired. The investigation of this crime uncovered a substantial criminal past for the defendant; indeed, prior to this trial, he pleaded guilty to another armed robbery. In mitigation, the trial judge noted potential hardship to the defendant's family; however, we agree with the trial judge that the defendant failed to calculate into his decision to engage in such criminal activities any harm which might result to his *699 wife and child should he be captured and incarcerated.
Under these circumstances, the 60 year sentence is not unconstitutionally excessive.

DECREE
For these reasons, the conviction and sentence of the defendant, Jessie Lee Smith, are affirmed.
AFFIRMED.
NOTES
[1] The motion to suppress was sustained insofar as it urged suppression of items found in the trunk of a maroon Cadillac owned by the defendant. The officers had opened the trunk and rummaged through it. A discussion ensued as to whether a warrant should first be obtained, and, deciding a warrant advisable, the officers closed the trunk. A warrant was subsequently obtained, but was defective because the probable cause upon which it had been issued had been derived at least in part from the warrantless search.
[2] There is some discrepancy as to whether the officer or the defendant reached into the vehicle. At any rate, the jacket was patted down after the sawed-off shotgun was observed in the back of the car.
[3] The shotgun was excluded from evidence at the defendant's trial on relevancy grounds since there was no evidence linking the shotgun to the robbery except for testimony that Leroy Jackson had carried a shotgun into the First State Bank. The state chose not to introduce either the jacket or the $86; nevertheless, the defendant urges that the trial court erred in failing to suppress these items pre-trial. Our disposition of this matter is also important to dispel any contention that the wrongful seizure of these items "tainted" unconstitutionally the subsequent search of the defendant's apartment. See Wong Sun v. U.S., 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
[4] According to the defendant's brief, Leroy Jackson received 35 years, Marie Terrell ("Sugar Mama") received 50 years, and Tony Smith has not yet been sentenced. For their lesser involvement as accessories, Mary Ann Crockett was sentenced to 20 months, and Jonah Cooper received 18 months.