YELVERTON, Judge.
Richard Hubmer, Sr., 23 year old father of a 15 month old boy, was convicted by a jury of manslaughter in the child’s death. The child died at their home near Leesville, Louisiana, on December 26 or 27, 1987. The trial judge sentenced the defendant to imprisonment at hard labor for 12 years. The defendant appeals both the conviction and the sentence on the basis of six assignments of error: (1) insufficiency of the evidence, (2) an improper jury charge, (3) the allowance of inadmissible testimony, (4) failure to grant a mistrial, (5) restrictions on the scope of the opening statement, and (6) an excessive sentence.
We affirm the conviction and the sentence for the following reasons.
(1)
SUFFICIENCY OF THE EVIDENCE
Defendant and his wife lived in a small house in a populated area near Leesville. They had a 2¾⅞ year old daughter and a 15 month old son. Defendant was in the army.
Five or six days before the child’s death the Louisiana Office of Human Development investigated a complaint of neglect of the children. Larry Rooker, a Social Service supervisor, testified that some neglect was found, but that it was corrected and the children were left with their parents.
At six o’clock on the evening of December 26, Hubmer was eating supper at the kitchen table with his two children. The mother, Donna, was standing at the stove. She heard but did not see several hard slaps inflicted on the 15 month old boy by his father. Hubmer testified that he slapped his child’s hand five times, part of an effort to train the child to eat with a spoon. The mother testified that, although she did not see where the blows were inflicted, she immediately remonstrated with her husband concerning the severity and number of the slaps. She testified that the child cried only for a short time.
Donna Hubmer testified that she later changed the children and put them to bed in their bedroom at 9:15 p.m. A space heater in the bedroom was lit because it was chilly.
At about 10:30 she heard her son whine once, and told her husband to check on him, but she could not recall whether her husband had in fact checked on the child. Both father and mother testified that at some point before midnight, Hubmer went across the street to use a telephone (the *1058 couple did not have a telephone) and placed collect calls to his grandmother and his mother in Minnesota. Hubmer testified that he was gone from the house from an hour to an hour and a half. Mrs. Hubmer testified that she did not go in the children’s bedroom during her husband’s absence.
At 1:20 or 1:30 a.m. on Sunday, December 27, according to Donna Hubmer’s testimony she went into the bedroom and turned on the light to check the children. They appeared to be all right, she turned off the light, closed the door, and she and her husband went to bed.
Sometime during the night the little girl got up and joined her parents in their bed. The next morning, at 10:00 or 10:15 a.m., the little girl woke up her mother who then went into the children’s bedroom to check on the infant. The door was shut and inside the room it was very hot. She went to the crib and discovered that the baby was blue and appeared dead. When she ran back into her bedroom and awakened her husband, he told her to run across the street and call an ambulance and then to wait on the front porch for the ambulance and police.
Hubmer testified in his defense. Substantially, his testimony was the same as that of his wife, with a few differences. One of these was a denial that she asked him to check on the kids at around 10:30 on the night of December 26. Hubmer explained that he never checked on them at night; she always did that.
He testified that his wife spanked the child and slapped him on the fact and back when she got angry, and that on occasion she disciplined the children excessively. He said that he had talked to her about that quite a few times.
Both the father and the mother testified that no one else was at the house that night. They testified that they had no explanation for the bruises that appeared on the right side of the child’s head as shown by the photographs later taken in the funeral home.
Dr. Chanh Vinh was on duty in the emergency room at Byrd Memorial Hospital in Leesville when the ambulance came with the body. He testified that the body was warm but that the child had been dead a long while. He found evidence that the body had been deliberately warmed up. He thought the redness on the buttocks happened after the baby was dead, perhaps from submersion in hot water, or direct bodily contact with another heat source. In his opinion the heat of the body could not have been caused by the heater in the room. There were bruises in the area of the buttocks and the right side of the head. There was red area below the right eye, which he said was a neurological sign of a skull fracture. He ordered skull x-rays. The body had an odor of death. Suspecting child abuse, he directed the emergency room supervisor to notify Fort Polk officials and the Child Protection Agency.
Dr. John Epling, a radiologist on the staff of Byrd Hospital, testified that he took x-rays requested by Dr. Vinh, while the body was still in the hospital and before it was taken to the funeral home. He testified that those x-rays revealed a fracture of the skull on the right side, and some soft tissue swelling over the right side of the skull.
From the emergency room the body was released to the funeral home for embalmment and transportation to Minnesota. Danson Trotti, a mortician, began the embalming process. He testified that he was suspicious when he first saw the body and that he called his suspicions to the sheriff’s attention. From his contact with the sheriff, he knew that the sheriff was going to follow up on the investigation. Nevertheless, he began the embalming process because he could see no way that this would impede or interfere with the investigation of the bruises. According to this witness, this was standard procedure, and he would have done it even had he known that within three or four hours the body would be transported to Shreveport for an autopsy.
The body was transported to Shreveport where an autopsy was performed on December 28, 1987, by Dr. George M. McCormick, II, a forensic pathologist and coroner of Caddo Parish. He testified at the trial *1059 that the embalming process, which was incomplete, did not affect his autopsy or his conclusions. His conclusions were that the head injury was made while the baby was alive, and that the blistering of the skin in the buttocks area was a result of decomposition, occurring after the baby had died. There was brain hemorrhage beneath the scalp that extended down to the skull itself, and there was also a bruise of the brain. His most significant finding was on the right side of the head, a finding consistent with a blow or slap to the head. He testified that the difference between brain damage from a fall on the head and a blow to the head is this: “If you fall and hit your head the damage itself is on the opposite side from the point of impact, whereas if you are struck on the head, the injury to the brain is on the same side as the point of impact”. This precept he described as “a relatively solid rule of pathology”. In the present case he testified that the injury was on the right side and the bruise, the point of impact, was on the same side. His final opinion was that a blow to the right side of the head injured the brain causing the failure of the child’s heart and lungs and his consequent death.
Dr. James Alvin Freeman, a pathologist, testified for the defendant. His opinion was based upon his review of the autopsy report made by Dr. McCormick, a transcript of pretrial testimony given by Dr. McCormick, and information supplied to him by the defendant’s counsel. He never saw the body. He disagreed with Dr. McCormick in a number of premises, but could not state that he agreed or disagreed with Dr. McCormick's final opinion. He disagreed with Dr. McCormick’s autopsy report statement that the cause of death was a blow to the child’s head. It was Freeman’s opinion that the true cause of death could not be elucidated from the autopsy as done. He based this entirely on the autopsy report. However, Dr. McCormick’s in-court testimony concerning what he found during the autopsy was much more elaborate than what was shown in his report, and Dr. Freeman admitted that he had not been present in the courtroom and had not heard Dr. McCormick’s testimony.
The upshot of Dr. Freeman’s testimony was that the swelling of the brain was caused by the embalming. Dr. McCormick’s testimony was that’the embalming did not interfere with his autopsy, and that the cause of death was a blow to the child’s head.
The defense in this case was that the state did not prove the cause of death beyond a reasonable doubt, and that it did not prove the death was caused by the defendant.
There was testimony that a social worker, in the house on December 22, 1987, just five days before the child died, as part of the investigation of child neglect, changed this baby’s diapers and noticed no abnormalities. Two physicians testified at the trial that there were bruises on the right side of the child’s head consistent with a blow or slap to the head, that had been made before the child’s death. The color photographs of the child taken at the funeral home clearly show these bruises. The defendant admitted that he slapped the child five times at 6 p.m. on the night before the death was discovered. Although the child’s mother did not see where the slaps landed, she knew from the sound that the slaps were too hard. Dr. McCormick stated that it does not take much to fracture a baby’s skull. He testified that the brain injury could not have been caused by a fall, but that it was caused by a blow to the head.
The pathological findings also ruled out any possibility that the child died from suffocation due to oxygen deprivation, or any other condition caused by the heat in the bedroom.
Our review of this conviction must be guided by the rules regarding circumstantial evidence, as well as the Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard as explained by the Louisiana Supreme Court in State v. Austin, 399 So.2d 158 (La.1981):
Regarding circumstantial evidence, R.S. 15:438 sets forth the rule that, in order to convict, the evidence must exclude every reasonable hypothesis of in *1060 nocence. Under Jackson, the evidence is viewed in the light most favorable to the prosecution and from the viewpoint of a rational trier of fact. Therefore, when we review a conviction based upon circumstantial evidence we must determine that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded.
The jury had evidence that the child died as a result of a blow inflicted on his head; the evidence shows the defendant committed a battery on his child the night before he was found dead; there was no other reasonable explanation for the death.
Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence was excluded.
(2)
IMPROPER JURY CHARGE
The defendant objected to the charge as to the law of principals, on the ground that there was no evidence and no facts at the trial on which the law of principals might be applicable. The trial judge overruled the objection and gave the charge, as follows:
Where two or more persons are involved in the commission of a crime, each may be held to be principals, depending upon the circumstances, even though one of them directly committed the act constituting the offense. Persons who aid and abet in the commission of a crime are guilty as principals although they do not directly commit the act constituting the offense.
The charge was based upon La.R.S. 14:24 which states:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
During its deliberations in the present case the jury sent the judge a written question asking:
If the jury finds the defendant guilty as charged will Donna Hubmer, wife and mother, be charged as an accessory?
In response, the judge called the jury into the courtroom and told them:
The question that you sent to the Court, however, is not really a question for further jury charges as I see it, and Counsel are in accord. And it has nothing — and it should not enter into your deliberations relative to this particular case, one way or the other. Beyond that, I can’t further instruct you....
We agree with the defendant that the charge on principals was improper. The jury was instructed that the defendant was charged with the crime of manslaughter in violation of La.R.S. 14:31, one of the definitions of which is the killing of a human being when the offender is engaged in the commission of any intentional misdemeanor directly affecting the person, even though there is no intent to kill or do great bodily harm. The jury was further instructed that in this case Richard Hubmer was accused of killing his son while engaged in the commission of an intentional misdemeanor, namely, a battery, directly affecting the person. The only evidence of a battery in this case on this child was what took place at the kitchen table at 6 o’clock on the eve of the day that the child was pronounced dead. There was no evidence presented at the trial that any person other than Richard Hubmer was concerned with the commission of that crime, as the term principal is defined in La.R.S. 14:24. For this reason we believe that the charge was unnecessary and should not have been given, because it was inapplicable to the case.
However, the giving of the charge was not reversible error. On this appeal, the defendant complains that the giving of the charge confused the jury, and calls attention to the question it sent to the judge during deliberations as evidence of that confusion. We disagree. Far from showing that the jury was confused, the note *1061 indicates that the jury clearly understood the law on the subject. The jury did not ask the judge whether, if they convicted Richard Hubmer, Donna Hubmer would be charged as a principal, they asked the judge whether she would be charged as an accessory. On the facts presented at this trial, that was the only charge that could have been filed against her, since her participation in the events occurred only after commission of the crime, and her culpability, if any, could only be based on La.R.S. 14:25, dealing with accessories after the fact.
This assignment of error has no merit. (3) & (4)
TESTIMONY OF INSURANCE COVERAGE AND FAILURE TO GRANT A MISTRIAL
The defense called Larry Rooker, the Office of Human Development Supervisor, as one of its witnesses. When the state had this witness on cross-examination the following exchange took place:
BY MR. CABRA:
Q Did he give you any other information in reference to his son — regarding his son on December the 27th when you talked to him personally?
WITNESS:
A Yes sir. He told me that the child was put to bed, that he tucked the child in at 10:00 o’clock or 10:30, I believe, or you know, 9:00 or 9:30. Put blankets on the child. He indicated there was an insurance policy on the child.
The witness then stated that he understood the policy was for $25,000. Further testimony along this line revealed that this was a military policy on defendant’s life, with dependent coverage of $5,000 per child, and that the policy had been taken out while the defendant was stationed in Korea long before the child was born.
After several questions on the subject of the insurance policy, the defendant objected. Defendant concedes in brief that his objection came too late and was therefore properly overruled.
Defendant’s main complaint under these two assignments of error is that his subsequent motions for a mistrial were improperly overruled. He argues that the prejudicial effect of the mention of insurance under La.C.Cr.P. art. 775 required a mistrial.
The trial judge denied a motion for a mistrial. We agree with the defendant that evidence of insurance coverage on the victim’s life was irrelevant, because the defendant was being tried under La.R.S. 14:31(2), the nonspecific intent variety of manslaughter. Nevertheless, we find no error in that ruling. The response concerning insurance was an unsolicited one and came from the defendant’s own witness. A motion for mistrial is a drastic remedy and should be granted only when the defendant suffers substantial prejudice, such that he is deprived of any reasonable expectation of a fair trial, in the determination of whether prejudice has resulted is within the sound discretion of the trial judge, whose ruling should not be disturbed absent an abuse of that discretion. State v. Smith, 433 So.2d 688 (La.1983). The jury learned that the policy was for a mere $5,000 and that it was taken out long before the child was born. Defendant was given the opportunity to fully question Mr. Rooker on the subject. He could also have questioned his wife when she testified on the matter, and he was allowed to present the life insurance application.
These assignments of error have no merit.
(5)
RESTRICTIONS ON THE SCOPE OF THE OPENING STATEMENT
Three times during the opening statement of the defense, the state objected that counsel was exceeding the scope of opening statement and was arguing his case to the jury. The trial judge sustained all three objections. On another occasion the trial judge himself cautioned counsel against arguing his case in the opening statement. On this appeal counsel argues that these rulings were arbitrary and of a one-sided nature in favor of the prosecution.
*1062 We have studied the opening statement and examined the objections, and rulings, in context. It is our opinion that the trial judge’s rulings, as well as his sua sponte interruption were appropriate. When defense counsel .avails himself of the opportunity to make an opening statement under La.C.Cr.P. art. 765(4), the statement must be confined to an explanation of the nature of the defense and the evidence by which he expects to establish it. State v. James, 459 So.2d 1299 (La.App. 1st Cir.1984), writ denied, 463 So.2d 600 (1985). In the present case counsel was allowed to go into great detail concerning the nature of the defense and the evidence he expected to establish. It was only when he began arguing the legal aspects of his alternative theories of the cause of the victim’s death, and of the lack of evidence and circumstan-tiality of the case against the defendant, that he was interrupted. Wide discretion is vested in the trial judge in his control of the opening statement to confine it within these limits. State v. Hodges, 526 So.2d 1275 (La.App. 3d Cir.1988), writ denied, 532 So.2d 174 (1988). We find no abuse of discretion in this case.
(6)
EXCESSIVE SENTENCE
Defendant was sentenced to 12 years at hard labor after being found guilty of manslaughter, which carries a maximum penalty of 21 years. La.R.S. 14:31. The trial court complied with the sentencing guidelines of La.C.Cr.P. art. 894.1. The sentencing judge gave consideration to the mitigating factors, i.e., the killing was an unintentional one, the defendant had no criminal record or history of violent behavior, and he was relatively young, defendant being 22 years old at the time of the homicide. Considering all of these mitigating facts, and more, the trial judge nevertheless believed a lesser sentence inappropriate because there was ample evidence that the victim had been subjected to a number of acts of physical abuse, followed by, and compounded by, a neglect in seeking medical attention. The judge also stated that he observed an “... apparent lack of remorse, feeling, contrition or sorrow, demonstrated” by the defendant. The sentencing judge believed that any lesser sentence would deprecate the seriousness of the offense. We are unable to say that the sentence of 12 years was excessive.
For the foregoing reasons the conviction and sentence are affirmed.
AFFIRMED.
KING, J., dissents and assigns written reasons.