CANNELLA, Judge.
Defendant, Paul Isenogle, appeals from his conviction of attempted first degree murder and his sentence to 40 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm the conviction and sentence.
On April 9, 1998, the Jefferson Parish District Attorney’s Office filed a bill of information charging the defendant with the attempted first degree murder of a juvenile under 12 years of age, a violation of La. R.S. 14:27:30. The defendant was arraigned on April 20, 1998 and he pled not guilty. The defendant filed a motion for a sanity commission and, on July 9, 1998, the trial court found that the defendant was competent to stand trial. A 12-person jury was selected on February 22, 1999. On February 23, 1999, the trial court denied the defendant’s motions to suppress x-rays and photos of the victim’s surgery and trial began. Trial continued on February 24, 1999 and on February 25, 1999, the jury, by a 10 to 2 vote, found the defendant guilty as charged.
On March 26, 1999, the trial judge sentenced the defendant to 40 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant filed a motion to reconsider the sentence, which the trial court denied on May 21, 1999. The defendant filed a timely appeal.
The following was derived from trial testimony. This case involves injury to 7 week old Megan Isenogle (Megan), the daughter of Lisa Krause (Lisa) and the defendant. Megan was born on December 30, 1997. At that time, Lisa had been dating the defendant for approximately 11 months. On February 18, 1998, Lisa left for work at about 6:00 a.m. and left Megan at home with the defendant. She had been to a Mardi Gras parade with Megan and the defendant the night before. Lisa testified that the defendant often awakened to feed Megan during the night and that the defendant had awakened to feed her some time between 1:00 and 5:00 that morning. At about 10:00 a.m. on February 18, 1998, the defendant called Lisa at work and told her that, while cleaning house, he had slipped and fell on the laundry bag, hitting Megan’s head on the bedroom door frame. The defendant told her that Megan was alright. Lisa asked the defendant if her daughter’s head was swollen, or if there were any marks on her, and the defendant replied in the negative. Nonetheless, Lisa called Sandra Isenogle (Sandra), the defendant’s mother, asking her to check on Megan.
Sandra called the defendant in response to Lisa’s request. She asked the defendant where he had bumped Megan’s head, whether the baby’s pupils were dilated, was there any vomiting, had the baby gone to sleep, was there swelling or discoloration and was the skin broken. The defendant responded negatively to all of Sandra’s questions.
Lisa came home from work early, at about 1:00 p.m. and found the Rdefendant holding Megan. He handed Megan to her and she immediately noticed that Megan’s head was swollen, looking like “there was a softball in it.” Lisa called Sandra, then called Megan’s pediatrician. On the pediatrician’s advice, the defendant and Lisa rushed Megan to the Emergency Room at East Jefferson General Hospital.
The Emergency Room physician, Dr. Creel, examined Megan and diagnosed her to be in shock with a temperature of 91 degrees. He observed a large swelling on her head and her eyes were deviated to the left. He stated that Megan was moving all of her extremities, but was “grunting” and probably did not have enough brain function to cry. Dr. Creel stabilized Megan and called Dr. Joseph Nadell, a pediatric neurosurgeon at Children’s Hos *99 pital. With the consent of Lisa, Megan was transported to Children’s Hospital.
Dr. Creel was told that the defendant had bumped the bab/s head into the side of a door, but he felt that Megan’s injuries were not consistent with that story. He further testified that his medical impression was that Megan was critically injured and close to death. He stated that a lay person should have known that Megan was injured because the side of her head was discolored and swollen 25 to 33% greater than its regular size. He testified that Megan was making funny noises and breathing strangely. He thought that the swelling would have occurred within a few minutes following the injury.
Paula Rodriguez was in charge of the transport team which took Megan to Children’s Hospital. She detailed Megan’s condition and said that the defendant told Dr. Nadell that he had bumped Megan into a door frame. She testified that Lisa was hysterical and that the defendant was quiet.
Dr. Nadell performed surgery on Megan and described Megan’s injury as | Ra cruciate fracture of the skull. Significant force had been applied to Megan’s skull, fracturing it in many places. He also told the jury that Megan had bleeding within her head and a subdural blood clot. Dr. Na-dell said that Megan had lost some brain tissue and would have future developmental difficulties resulting from the injury. Pictures were admitted into evidence depicting these injuries.
Lieutenant Maggie Snow of the Jefferson Parish Sheriffs Office testified that she went to Children’s Hospital and interviewed the defendant. Based upon her conversation with the defendant, she returned with him to his apartment, where the police photographer took some pictures. Lt. Snow took the defendant to the police station and read him his rights. The defendant waived his rights and gave Lt. Snow a statement.
In that first statement, which the jury heard, the defendant told Lt. Snow that the injury to Megan occurred when he tripped over a laundry bag while holding her, banging Megan’s head into the door trim. Lt. Snow called Dr. Nadell after taking the statement and was told that Megan’s injuries were not consistent with the defendant’s story. Lt. Snow relayed this information to the defendant, at which point he gave her another statement.
In the defendant’s second statement, which was also played for the jury, he told Lt. Snow that he had not told the truth in the first statement. The defendant stated that, on the morning of February 18, 1998, he had taken the sleeping Megan out of her crib to try and feed her. She would not eat. Defendant placed the baby beside him in the bed, hoping that they could both go back to sleep. He told Lt. Snow that he was lying beside her on the bed and she was fussing. The defendant stated that with his left hand he “reared back” and hit Megan in the side of her head forcefully with a closed fist. He told Lt. Snow that he was left handed.6 The defendant revealed that, after he hit Megan, he left her alone on the bed for about an hour. At that time, when he went back to check on her, he noticed some swelling and noticed that the baby was having trouble breathing, so he called Lisa at work. Lt. Snow told the jury that the defendant did not ask to check on his daughter or return to the hospital. Lt. Snow testified that the defendant only got emotional when he stated that he was afraid for himself.
The defendant testified on his own behalf. He said that Lisa became pregnant about a month and a half after they first met. He testified that he wanted to marry Lisa and that he wanted the baby. He also told the jury that he had lost his job because he spent too much time home with Lisa during the pregnancy. The defendant testified that, on February 17, 1998, he went to a Mardi Gras parade with Lisa and Megan. He told the jury that they came home and went to sleep at about 1:00 *100 a.m. The defendant told the jury that he woke up twice during that night to feed Megan.
After Lisa left for work on the morning of February 18, 1998, the defendant placed Megan on the bed next to him. Megan started crying. The defendant told the jury that “out of frustration, because I couldn’t get her to stop crying, I lashed out at her while on the bed and struck her on the left side of her head.” He testified that he hit her with the closed fist of his left hand. He told the jury that he was left-handed. After hitting Megan, the defendant looked at her “in shock” and left her on the bed. He told the jury that after he hit Megan she was making “grunting sounds” and had trouble breathing. The defendant left Megan on the bed for about an hour, then moved her to her crib. He recalled that Lisa came in at about 1:00 p.m., after which they took Megan to the hospital. He testified that although he noticed that the swelling on Megan’s head progressed throughout the day, he didn’t think that the injury was severe enough to take Megan to the hospital.
The defendant told the jury that he lied to Lisa about hitting Megan, because he was ashamed and didn’t want to admit what he had done. He further said that he knew the injury was serious but lied about its cause to Dr. Nadell and Dr. Creel because he was afraid for himself. The defendant testified that he didn’t intend to hurt or to kill Megan, but he lashed out in frustration. He said that he pondered the consequences of his actions, but didn’t think that her injuries were severe enough to take Megan to the hospital. The defendant at first said that he had never been arrested, but on cross-examination he admitted a previous arrest for a minor offense.
Dr. Jim Klein, an expert in clinical psychology, on behalf of the defendant testified that he had examined the defendant and reviewed the defendant’s past records. It was his opinion that the defendant had a history of broken attachments, difficulty controlling impulses and a “flat” emotional response. Dr. Klein’s interview with the defendant revealed that the defendant wanted to make his relationship with Lisa work, but that he was fed up with doing everything for the baby and not bringing money into the home.
Dr. Klein told the jury the version of events related to him by the defendant, that on the morning of February 18, 1998 he woke Megan to feed her, but Megan was not hungry. The defendant told Dr. Klein that he became fed up and “hit the baby like he would hit a man.” Dr. Klein told the jury that there was nothing to suggest that the defendant felt resentment toward Megan, that he was just frustrated with the situation.
On appeal defendant assigns four errors.

ASSIGNMENT OF ERROR NUMBER ONE

By this assignment of error defendant argues that the evidence was insufficient to support his conviction of attempted first degree murder. More specifically, defendant argues that the State failed to prove, beyond a reasonable doubt, that he had the required specific intent to kill the victim.
The State argues to the contrary that the requisite intent was established by the evidence.
In reviewing the sufficiency of the evidence, due process requires the reviewing court to determine “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and *101 determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
The defendant was convicted of attempted first degree murder of a victim under the age of 12, as charged. First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon a victim who is under the age of 12 or 65 years of age or older. La. R.S. 14:30(A)(5). “Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.” La. R.S. 14:27.
To prove an attempted murder, whether first or second degree, the State must establish, beyond a reasonable doubt, that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. La. R.S. 14:27, 14:30; State v. Fauchetta, 98-1303 (La.App. 5th Cir.6/1/99), 738 So.2d 104, 108; State v. Guccione, 96-1049 (La.App. 5th Cir.4/29/97), 694 So.2d 1060, 1067. Although specific intent to inflict great bodily harm may support a murder conviction, attempted murder requires a specific intent to kill. State v. Fauchetta, supra; State v. Holmes, 94-907 (La.App. 5th Cir.3/15/95), 653 So.2d 642, 645.
Specific intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. State v. Haynes, 98-588 (La.App. 5th Cir.2/23/99), 729 So.2d 104, 107. Specific criminal intent, a required element of this crime, does not have to be proven as fact, but may be inferred from the circumstances and actions of the defendant. State v. Sanders, 99-106 (La.App. 5th Cir.9/15/99), 742 So.2d 1009, 1014. The determination of whether the requisite intent is present in a criminal case is a matter for the trier of fact, and a review of this determination is to be guided by the Jackson standard. State v. Haynes, supra.
The defendant admitted at trial that he struck Megan. However, he asserted at trial and asserts in this assignment of error that the evidence was insufficient to prove beyond a reasonable doubt that he had the specific intent to kill her. We disagree.
The testimony in the case showed that the defendant hit the victim with a great deal of force. Although, as Dr. Creel testified, a lay person would have been able to notice the baby’s severe swelling and discoloration, the defendant did not seek medical attention and told Lisa and his mother that Megan seemed alright. Finally, Lt. Snow testified that the defendant did not seem to show remorse for his actions, or concern for Megan. Based on these circumstances, the extreme young age and very great vulnerability of Megan, and the defendant’s actions, we find that the evidence was sufficient for a rational trier of fact to find that the defendant had the requisite specific intent to kill her.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBERS TWO AND THREE

By these assignments of error, the defendant argues that the trial court erred in allowing the State to introduce color photographs of the victim’s brain surgery. He further argues that the photographs so prejudiced the jury that he was denied a fair trial.
During Dr. Nadell’s testimony at trial, the trial court admitted his photographs. of Megan’s surgery. The defendant argued prior to trial, at trial and now on appeal, that these photographs are inadmissible and so prejudicial as to warrant *102 a reversal of his conviction. The State argues that the probative value of the photographs far outweighed any prejudicial effect that they may have had.
For photographs to be admissible they must first be relevant, that is, they tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. arts. 401 & 402. However, even if relevant, photographs will be excluded if the probative value of the photographs is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. La. C.E. art. 403.
At issue in this case is the defendant’s intent in striking the victim. Thus, the severity of the blow is relevant to the case. Dr. Nadell testified in detail about the blood clot that had formed under the skin on the left side of the skull and about the size and number of fractures of the skull. The photographs gave a visual depiction of what the doctor was describing. The photographs showed the skull fractures and the blood clot as well as the blood around the brain, all indicating severe trauma. The severity of the blow is relevant in establishing the defendant’s intent in striking the child.
Further, while relevant, they are not particularly prejudicial. The photographs in the instant case show the type and severity of the victim’s wounds and served to corroborate Dr. Nadell’s testimony describing the type of injury which Megan suffered. Although the photographs were graphic, they were clinical, surgical photographs and did not show the face or body of the victim, appearing less gruesome than post-mortem photographs found to be admissible in other cases.
Thus we find that the photographs were relevant to prove an essential element of the case and were not so prejudicial as to outweigh their admissibility. We find no error in the trial court ruling admitting the photographs of the surgery into evidence.
Moreover, even if the admission of the photographs was error, their admission would be harmless in the overall context of the testimony and other evidence of record in this case. These photographs, while graphic depictions of |12brain surgery, were not so prejudicial as to have overwhelmed the jurors’ reason and lead them to convict the defendant without sufficient other evidence.
These two assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER FOUR

By this assignment of error defendant argues that the 40 year sentence imposed by the trial' court is excessive and shows that the trial court did not consider any of the mitigating evidence. The State responds that the sentence is not excessive given the nature of the offense.
In reviewing claims of excessive sentence, an appellate court uses a two-step process. First, the record must show adequate consideration of the criteria set forth in La.C.Cr.P. art. 894.1. State v. Smith, 433 So.2d 688 (La.1983). The trial court is not required to list every aggravating and mitigating circumstance so long as the record reflects adequate consideration of the guidelines of the article. Smith, supra. The articulation of the factual basis for the sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Remand is unnecessary when a sufficient factual basis for the sentence is shown. State v. Lanclos, 419 So.2d 475 (La.1982). The sentencing record should reflect that the trial judge considered not only the seriousness of the crime and the past criminal history of the defendant, but also the defendant’s personal history (including age, mental status, dependants, family ties, employment record and health) and the potential for rehabilitation. State v. Quebedeaux, 424 So.2d 1009 (La.1982).
*103 The second step of the inquiry requires an examination of the circumstances of the case and the background of the defendant. A sentence violates the constitutional proscription against excessive sentences if it is considered grossly disproportionate to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Lobato, 603 So.2d 739 (La.1992); State v. Daigle, 96-782, p. 2 (La.App. 5th Cir.1/28/97), 688 So.2d 158. In reviewing a sentence for excessiveness, this court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so grossly disproportionate as to shock the sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing sentence. A sentence within statutory limits will not be set aside as excessive absent manifest abuse of discretion. State v. Bacuzzi, 97-573 (La.App. 5th Cir.1/27/98), 708 So.2d 1065, 1068-1069.
The defendant was convicted of attempted first degree murder and faced a sentencing exposure of 10 to 50 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30,14:27.
Upon sentencing the defendant, the trial court stated:
All right, I think with reference to the condition of the baby, I think the medical testimony during the trial will shed more light on that than anything I can say or any one else can say.
What sticks out in my mind is that during the course of the trial the testimony of the defendant himself was that he was not worried or he was worried about himself and not the baby. This was brought out several times. I think that’s very important in the Court’s mind.
The defendant argues that the trial court did not consider the mitigating factors of the defendant’s age, familial status and lack of prior criminal record. However, the record reflects, by the trial court’s reference to the trial testimony, that the trial court was aware of those circumstances.
In the instant case, considering the victim’s tender age, her extreme vulnerability, the force used by the defendant and the severity of the injury, we find that, although the reasons for the sentence were not exhaustively articulated, the trial court did not abuse its sentencing discretion in imposing a 40 year imprisonment at hard labor sentence without benefit of probation, parole or suspension of sentence.
This assignment of error lacks merit.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Godejohn, 425 So.2d 750 (La.1983); State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). The review reveals no errors patent in this case.
Accordingly, for the reasons set forth above, we affirm the defendant’s conviction for the offense of attempted first degree murder and his sentence to 40 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
CONVICTION AFFIRMED; SENTENCE AFFIRMED.