426 So.2d 95 (1983)
STATE of Louisiana
v.
Ray Charles JOHNSON.
No. 82-KA-0045.
Supreme Court of Louisiana.
January 10, 1983.
Rehearing Denied February 11, 1983.
*96 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., James L. Davis, Dist. Atty., Abbott J. Reeves, Asst. Dist. Atty., for plaintiff-appellee.
Ted Brett Brunson and Ralph S. Wright, Lowther & Boone, Many, Wellborn Jack, Jack, Jack, Cary & Cary, Shreveport, for defendant-appellant.
DIXON, Chief Justice.
Ray Charles Johnson was tried by a jury on October 22, 1981 and was found guilty as charged of second degree murder (R.S. 14:30.1). He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension. Defendant now appeals his conviction and sentence arguing five assignments of error.
Defendant resided with Ernie Mae McElroy in Apartment 120 in the housing project in Zwolle, Louisiana. Ms. McElroy's four year old son, Barcelis, resided with them. This son was from her previous marriage to the victim, Randolph Davis.
On December 1, 1980, at approximately 1:00 p.m., Davis went to the residence of defendant and Ms. McElroy and asked Ernie Mae if he could see his son. On the front porch Davis took the child in his arms and attempted to pick him up, but Ernie Mae grabbed the child away from him. Davis began hitting Ernie Mae in the face and she called the defendant for assistance. Defendant, inside getting dressed for work, did not hear her until she called a second time.
Defendant, Ernie Mae and Elliot Shepard, all witnesses for the defense, testified that when defendant responded to Ernie Mae's plea for help, Davis reached through the screen door for the defendant with a knife. The defendant then returned to the back of the house to the bedroom to get his gun. While the defendant was back in the house, Davis continued beating Ernie Mae. Upon his return to the front door, defendant fired one shot, apparently at an upward angle, in order to scare Davis.
There are essentially two versions of the events which occurred after the defendant fired the initial warning shot through the screen door.
This shot caused Davis to turn and leave the porch. Defendant and Ernie Mae testified that Davis fell on the porch as he was attempting to leave, and that defendant fired two shots at Davis as he tried to get up and go toward the street to his car. Once Davis reached his car, he reached in his pocket for his car keys near the trunk of his car. At this point the defendant testified that he descended from the porch and stopped on the sidewalk. He called out to Davis warning him not to go into his trunk, since he knew that Davis was known for carrying a gun. Then defendant again fired at Davis.
Elliot Shepard testified that Davis then ran behind the Evans house and toward Cleo German's house and that no one was running behind him. Davis attempted to ascend Cleo's porch, but fell, knocking over a bike, and then died. The defendant testified that after Davis ran away from his car, he returned to Ernie Mae to attend to her injuries. He further testified that he went into the house to get a towel, emptied the shells and reloaded the gun and then took Ernie Mae and the gun over to Autrey Lee Carter's house. Carter testified that defendant left the reloaded gun at his house with instructions to give it to anyone who asked for it. Carter turned the gun over to the authorities when they arrived.
After leaving the gun and Ernie Mae with Carter, the defendant testified that he went to Cleo German's house where there was a crowd gathering. Cleo told the defendant not to come in her yard, and defendant turned and returned to his home.
Andy Pantalion, a white man who lived across the park from the Zwolle project, was also an eyewitness to the shooting. The distance from which he viewed the shooting is approximately two hundred thirteen yards. His version of the incident is substantially different from that of the defense witnesses. He testified that he heard the first shot, turned around and saw the defendant chasing Davis. He then saw Davis *97 fall down and the defendant fire four shots as Davis lay on the ground, under the clothesline behind the Evans home. There were others who testified that they heard these four shots. Defendant then returned to his house, emptied his shells and reloaded his gun. He went to where the victim lay, with his gun in his hand, and was told to leave the yard by Cleo German.
The coroner testified that Davis was struck by three bullets, but only one of these bullets inflicted the fatal wound. The other two bullets did not lodge in the body and caused only superficial wounds.
The police who came to the scene in response to calls testified that there was no knife or other weapon found on the person of Davis, nor in the immediate area. Davis was found holding a set of car keys in his hand.
To further support the state's theory that the defendant chased Davis and shot him while he was lying on the ground, the state attempted to offer pictures into evidence of holes in the ground in the approximate location where Pantalion testified that he saw the shooting. The defense objected and the court sustained the defendant's objection. The state was allowed to introduce the testimony of Chief Detective John Ranier to the effect that they discovered holes in the ground behind the Evans home under the clothesline. He further testified that they dug to find the projectiles, but this search was unsuccessful.

Argument 1 (Assignment of Error No. 1)
The defendant contends that the trial court erred in denying a mistrial based upon the nondisclosure by the state of an oral statement made by the defendant immediately after his arrest to Officer Dean Lambert. This statement concerns the victim's possession of a knife. The defendant argues that this oral statement is Brady material. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
Substantial evidence was presented by the state at trial that no knife was recovered from the victim's body, nor from the immediate area. There were two written statements made by the defendant which were made available to the defense prior to trial in response to the defendant's discovery motions. The first written statement made by the defendant to the officers does not mention a knife.[1] The defendant's second written statement, which was made six to eight weeks later, specifically mentions that the victim had a knife.[2] *98 Officer Lambert testified at trial that the defendant made an oral statement to him, shortly after his arrest, to the effect that the victim had a knife. This statement as to the victim's possession of a knife was in response to the officer's question. This information about the oral statement was contained in Officer Lambert's police report, yet it was not disclosed to the defendant. After this exculpatory testimony, the defense moved for a mistrial on the basis that the police report was not furnished to the defendant as requested during discovery. C.Cr.P. 775.
The state maintains that it was not obliged to produce the police report under C.Cr.P. 723, but was required to produce only the written statements. Further, it contends that this oral statement contains substantially the same information which was contained in the second written statement. The defendant maintains that the disclosure of this information falls within the exceptions established by C.Cr.P. 723, and that its disclosure was mandated by C.Cr.P. 718(1) and Brady v. Maryland, supra.
Exculpatory evidence must be provided to the defense when it is material to guilt or punishment, regardless of the good faith or bad faith of the prosecutor. Brady v. Maryland, supra at 87, 83 S.Ct. at 1196. In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court delineated three tests of materiality, depending on the type of request presented by the defense to the prosecutor. This case falls under the third category of cases set forth in United States v. Agurs, since the request for information was for all Brady material. This court in State v. Willie, 410 So.2d 1019, 1031 (La. 1982), discussed the analysis for this type of request when there is undisclosed evidence which may constitute Brady material.[3] Reversible *99 error results when the undisclosed evidence, considered in the context of the entire record, "creates a reasonable doubt that did not otherwise exist." United States v. Agurs, supra 427 U.S. at 112-13, 96 S.Ct. at 2401-02.
In the instant case the defense in its discovery motion requested:
"That the District Attorney permit or authorize the Defendant to inspect, copy, examine, test scientifically, photograph or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof which are within the possession, custody or control of the State in which: (a) are favorable to the Defendant and which are material and relevant to the issue of guilt or punishment, or (b) are intended for use by the State as evidence at the trial, or (c) were obtained from or belonged to the Defendant."
This is a general, not a specific, request for Brady material.
The nondisclosure of the oral statement does not create a reasonable doubt which did not otherwise exist. The jury was presented with the evidence through the testimony of Officer Lambert. State v. Hicks, 395 So.2d 790 (La.1981). Furthermore, the defense presented, through the testimony of the defendant, Ms. McElroy and Elliot Shepard, evidence that the victim had a knife. The possibility of the existence of a knife in the possession of the victim was well known to the defendant.
Defendant has made no showing that this additional evidence would have altered his defense, nor has he shown that, by its nondisclosure, he has been denied a fair trial. On the contrary, Officer Lambert's testimony was supportive of his defense of self-defense. This evidence, although exculpatory, evaluated in the context of the entire record, does not create a reasonable doubt as to the defendant's guilt.
This assignment of error lacks merit.

Argument 2 (Assignment of Error No. 3)
Defendant argues that the trial court erred in denying a mistrial based upon the prosecutor's reference to the defendant's right against self-incrimination. C.Cr.P. 770(3).[4]
During direct examination, Mary Jean Ford, a state witness, was asked to view photographs of the scene. At that time she stated that she was "dizzy" because she had just gone to the doctor for a shot. When questioned as to why she was dizzy, the following colloquy occurred:
"A the only thing I could see wasI'm dizzy right now. This is my house (indicating on exhibit). I can't see it all.
Q What's the matter with you now?
A I took a shot when I went to the doctor while ago.
Q How come you had to go to the doctor while ago?
A I had some pressure on me and I couldn't take it.
Q What kind of pressure? Speak loudly so these folks can hear it.

*100 A Ray Charles was talking to me.
Q Ray Charles Johnson, this fellow over here?
A Yes, sir.
Q What did he tell you?
MR. WRIGHT: Objection, Your Honor. Now we are going to do this out of the presence of the jury.
DISTRICT ATTORNEY: Going to do what out of the presence of the jury?
MR. WRIGHT: I object, Your Honor.
DISTRICT ATTORNEY: If it please the Court, she can repeat anything this man said.
MR. WRIGHT: She can't.
DISTRICT ATTORNEY: He's in Court. He can get up there on the stand and deny it.
MR. WRIGHT: I object and I move for a mistrial, Your Honor. He cannot refer to the failure of the defendant or the fact that he does or does not testify at all.
THE COURT: Just a minute. Take the jury out, please.
(Jury leaves the courtroom)."
The prosecutor explained to the court that the remark was intended to explain the exception to the hearsay rule, which would enable Ms. Ford to testify as to what the defendant told her. The defense counsel insisted that the prosecutor's comment was meant to refer to the fact of whether the defendant testifies or not. The trial court denied the defendant's motion and ruled that the comment did not fall within the prohibition of C.Cr.P. 770(3).
While the jury was out, Ms. Ford told the court about the incident with the defendant, near the witness room, which caused her to become distressed. After recounting her story, the jury was brought back in and admonished by the trial court to disregard any statement made by the prosecutor regarding the defendant's right not to testify.
This court has held that to constitute reversible error under C.Cr.P. 770(3), "the inference must be plain that the remark was intended to bring to the jury's attention the failure of the defendant to testify." State v. Murray, 375 So.2d 80, 86 (La.1979) (emphasis added). See State v. Stephenson, 412 So.2d 553 (La.1982); State v. Curry, 390 So.2d 506 (La.1980); Clark v. Marullo, 352 So.2d 223 (La.1977); State v. Schouest, 351 So.2d 462 (La.1977); State v. Frank, 344 So.2d 1039 (La.1977); State v. Smith, 327 So.2d 355 (La.1976); State v. Reed, 284 So.2d 574 (La.1973); State v. Howard, 262 La. 270, 263 So.2d 32 (1972). However, it was recently held in State v. Fullilove, 389 So.2d 1282, 1284 (La.1980), that "[w]hen the remark directly points out that the defendant has not testified, it is irrelevant whether the prosecutor intended the jury to draw unfavorable inferences from the defendant's silence." (Emphasis added).
The remark in the instant case by the prosecutor was not intended as a reference to the defendant's right against self-incrimination; rather it was intended as an explanation of an exception to the hearsay rule. Further, the defense counsel in his opening statement specifically stated that the defendant would take the stand at trial, and the defendant did in fact take the stand to give his version of the shooting. The entire colloquy in the presence of the jury was prompted by a defense objection on hearsay grounds, and only became an issue under C.Cr.P. 770(3) when the prosecutor attempted to respond to the defense's objection. The jury heard the comment in light of the hearsay objection and not as a remark calling attention to the defendant's failure to testify in his own defense; the decision of the defendant to testify had already been made before this exchange occurred.
This assignment of error lacks merit.

Argument 3 (Assignment of Error No. 4)
Defendant contends that the evidence is insufficient to establish second degree murder, and that under the Jackson v. Virginia standard the evidence presented would only have justified a verdict of manslaughter.[5]Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1970).
*101 The standard of review for the consideration of a sufficiency claim is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, supra at 319, 99 S.Ct. at 2789. This court has consistently applied this standard of review when considering sufficiency of the evidence. State v. Ennis, 414 So.2d 661 (La.1982); State v. Stewart, 400 So.2d 633 (1981); State v. Guillot, 389 So.2d 68 (La.1980); State v. Landry, 381 So.2d 462 (La.1980); State v. Mathews, 375 So.2d 1165 (La.1979); State v. Abercrombie, 375 So.2d 1170 (La. 1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980).
The state's witness, Andy Pantalion, testified that he heard a shot which drew his attention, and that he then witnessed defendant's pursuit of Davis, Davis' subsequent fall, and defendant's firing of four shots with a .357 magnum revolver as the victim lay defenseless on the ground. There were other witnesses, neighbors of the defendant, who testified that they heard these four shots in addition to the first one.
Police who immediately responded to the scene testified that no weapon was found on Davis's body, near his body, nor the immediate area. A set of car keys was the only object which the victim held in his hand.
The coroner testified that Davis was struck with three separate bullets, one of which inflicted the fatal wound. Only the first shot fired by the defendant through the screen door could have been arguably made in self-defense, or with reasonable provocation, if it is assumed that Davis had a knife. However, the state established, by the testimony of the coroner and Detective Rainer, that this first shot could not have inflicted the fatal wound since the location of the bullet hole in the screen did not correspond with the entrance location of the fatal bullet. The fatal shot was one of the several shots fired by the defendant as Davis attempted to flee from the defendant.
Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the defendant guilty of second degree murder beyond a reasonable doubt.
This assignment of error lacks merit.

Argument 4 (Assignment of Error No. 5)
Defendant contends that Ms. Ford's testimony concerning an earlier conversation with defendant during a trial recess, outside the witness room, was irrelevant, and that its probative value was outweighed by its prejudicial effect. Further, he asserts that Ms. Ford was in a drugged state and thus was not in a condition to truthfully testify. The trial court allowed Ms. Ford to testify concerning her conversation with the defendant.
In response to the state's questioning of why she was upset, Ms. Ford testified:
"Q You are Mary Jean Ford?
A Yes, sir.
Q I had asked you, Miss Ford, why you were having some difficulty. What was your response?
A Well, I said when we got on lunch break, we were walking down the hall, you know, going to lunch. I rides down here with Cleo German so me and her go to lunch together. Well, I met, you know, Ray Charles going out and he asked me could I help him. And I told him, you know, no, that I couldn't help him because I had seen him Monday and I wasn't going to lie.
Q Is that what you told the defendant, Ray Charles Johnson, today?
A Yes, sir."
Ms. Ford then testified as to her observation of the events on December 1, 1980, the date of the shooting of Davis.
Defense counsel cross-examined Ms. Ford as follows:

*102 "BY MR. WRIGHT:
You didn't see Mr. Davis running in front of this defendant?
A All I could see was Ray Charles.
Q Now, right now you are under sedation from a doctor, right?
A Yes, I am."
The state then conducted redirect examination in an attempt to rehabilitate the witness, and to explain to the jury the reason Ms. Ford was sedated. The redirect was as follows:
"Q Why are you under sedation from the doctor?
A Well, I had a little pressure put on me in the hall.
Q By who?
A By Ray Charles.
Q By who?
A Ray Charles.
Q Would you explain what you mean, had the pressure put on you?
A Well, when I was going to lunch, you know, and I come back in the witness room, I left Cleo downstairs and I would be waiting on her in the room here. So just as I go in there, Ray Charles come by and he was still talking. And I was standing in the doorway, and he was standing, you know, right beside me. And he told me all I would have to say was I didn't see him running but I told him I couldn't lie.
Q Is that how come you
A I can't take too much pressure. It was too much pressure. I just, you know
Q You went to the doctor?
A Yes, sir.
Q He gave you a shot?
A He gave me a shot.
Q And when he asked you a minute ago about the sedation, that's the result of that pressure, is that right?
A Yes, sir."
Counsel for the defense on recross-examination then asked:
"Q The last time we came up here for a hearing, did you have to go to the doctor that day, too? The pressure was too great?
A No, I had an appointment to go to the doctor. I had been there a week before.
Q In fact, you have a nervous condition of some sort, don't you?
A No, I had a touch of pneumonia the first time and on the 18th of April when we come back down here, I had to go back. On the 18th day of May when I came down here, I had to go back for a check-up.
Q But you just told us the exact truth right there, huh?
A Yes, sir."
Relevant evidence is defined in R.S. 15:441 as:
"... that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent.
Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact, are admissible."
This court has held that evidence of attempts by a defendant to intimidate witnesses for the state has substantial probative value; and that actions on the part of the defendant which are designed to prevent witnesses from testifying will give rise to an inference that the defendant acted from an awareness or consciousness of his own guilt. State v. Burnette, 353 So.2d 989, 992 (La.1977); State v. Davis, 154 La. 295, 314, 97 So. 449, 455 (1923). As stated by this court in State v. Burnette, supra at 992: "... Such evidence ... has substantial probative value in a proceeding designed to test the guilt or innocence of an accused...." The exertion of pressure on Ms. Ford by defendant clearly would fall within the rule of State v. Burnette, and therefore, the subject was relevant to the issue of defendant's guilt or innocence.
What the defendant said to Ms. Ford could hardly be considered an attempt to intimidate a normal witness. Even a normal witness, however, would have concern and apprehension about being required to testify and place the blame on the accused. Since she disclosed her apprehension, and *103 blamed it on "pressure" by the defendant, it was not error to permit the state to inquire into the "pressure" to enable the jury to evaluate the testimony.
This assignment of error lacks merit.

Argument 5 (Assignment of Error No. 6)
Defendant contends that the trial court improperly allowed Detective Ranier to testify that there were "holes" in the ground under the clothesline since an examination of the holes did not recover any projectiles. Defendant argues that such evidence was not relevant and its probative value did not outweigh the prejudicial effect.
During the state's direct examination of Detective Ranier, the state attempted to introduce a photograph of the scene which showed "holes" in the ground. Defense counsel objected and the trial court sustained the objection and excluded the photograph from evidence. The state then proceeded to present the testimony of Detective Ranier who stated that the authorities found holes in the ground under the clothesline where the defendant was shot, according to Mr. Pantalion. Detective Ranier further testified that they dug out the holes as deeply as they could, but found nothing.
Relevant evidence is that tending to show the commission of the offense or intent, or that tending to negate the commission of the offense or intent. R.S. 15:441. The record indicates that the testimony of Mr. Pantalion and that of the coroner support the state's theory and the possibility that the holes in the ground were bullet holes. The jury had before it the testimony of Detective Rainer, that although they dug into the holes, they did not dig as deep as was possible because they only used a common kitchen knife, and that no projectiles were ever found in the holes. The probative value of this testimony as to the holes clearly outweighs any prejudicial effect.
This assignment of error lacks merit.
Accordingly, the conviction and sentence of the defendant are affirmed.
NOTES
[1] The following is the defendant's first written statement which he gave on December 1, 1980, the date of the shooting:

"I, Ray Charles Johnson was in my bedroom getting my work clothes ready and hears Randophy Davis outside beating up on my lady and walk to the door and told him not to hit her any more and he said what in the hell is you and reach for the screen door, so I turn around and we (sic) into the bedroom to get my gun and when I got back to the door she was holding the baby and he was still hiting (sic) on her that when I shot to make him leave her alone. This was around 1:00 o'clock and I went behind him and he fell down and got up that's when I shot him again because I thought he was going to turn on me.
 s/Ray Chas. Johnson
Witnessed by:
s/Wayne Ebarb
s/Quinton Brandon"

[2] The defendant's second written statement, which was written six to eight weeks after the first statement, but which was not dated, reads as follows:

"Sabine Parish Jail
I, Ray Chas Johnson, do swear to tell the truth, on Wednesday before Thanksgivings, my lady Earnie Mae ask me to take her to Big Star before I went to work, somewhere between 1:30 and quarter to three. I was in the bathroom brushing my teeth and heard someone knock, and a few minutes later my stepson who is four was saying I don't want to see that ugly man, my daddys (sic) name Ray Charles Johnson, this is when I came out, on my way to the bedroom, and my lady was in the living room, and said that was Barcelis father saying he wanted his son. I been with them a year in Jan., and he never come there before now, so after the holidays he came back that Monday between 12:30 and 1:00 and Earnie Mae met him at the door, so when I was on my way too (sic) the kitchen he was walking down the sidewalk, and I ask her what did he want, and she said he wanted his son, the baby was across the street playing with a neighbors (sic) little boy, and I heard some one ask Earnie Mae if she wanted Barcelis to come home, and she said yes, so there he come running back home, his father got back on the porch a little bit after the baby did, so I went back into the bedroom, getting my work clothes together and went back into the kitchen to get my work boots, and heard him saying he believe someone is influence (sic) his son not to want him that he created this boy, and if it was someone he was going to kick some ass, this is when I walk to the front door and look out, and he was still looking at my lady, so I go back to the bedroom with my boots, and by the time I put them down, I heard something hit against the screen door and my name call, on my way to the living room, I could see her holding the baby, and he was beating her with the baby in her arms, and her head was beening (sic) knock back and forth to those brick of the apartment, and I rush to the front door and push the screen door back and said don't you hit her any more, and he said who in the hell you think you are and reach at the door with a knife in his right hand, so I turn around and went back into the bedroom and got my pistol. When I got back to the living room he was still beating her holding on to her baby both of them was hollering so I came out shooting, one shot to depart them, he turn to run slipping on the porch, and when he was trying to get his balance he fell up against the wall facing me with the knife at his side, that's when I shot three or four times and he started running toward his car parked in front of mines and I shot again so he turn and went between my car and his across the streets around those other projects and Earnie Mae was then laying down on the ground with the baby beside her, I kneel down and got her up blood was just running down the left side of her face, I went inside to get a towel, and went into the bedroom and got I think there was four or five shells, was all I had left and reloaded my gun leaving the empty on my bed and went back outside to give my lady the towel, she was over to the neighbors (sic) house calling the police, so I walk across the street to see if I could see him, and this woman was hollering thru (sic) her window saying don't come in her yard, and I stood where I was for about 3 seconds, and went back home so I could see from my front yard to see if anyone was going to take that knife from him cause there so many people standing around him, I walk over to the neighbor house where my lady was talking on the phone, and Mr. Quinton Brandon pull up and we walk out leaving my pistol with my neighbor to Mr. Brandons (sic) car, and he ask, Ray Charles what's wrong, and my lady said she wanted to press charges against her X, and Mr. Brandon ask me how bad is she hurt, I couldn't tell because she was bleeding heavily, and Mr. Brandon told me to get in my car and take Earnie Mae to the hospital, and Mr. Dean Lambert meet me at the hospital, and we walk over to jail and he read me my rights. And this is the earnest God truth.
 s/Ray Chas. Johnson"

[3] This court in State v. Willie, supra at 1031 stated:

"The third category of cases consists of those in which a general request (`all Brady materials') or no request at all is made. A conviction will be overturned, in such cases, if the omitted evidence creates a reasonable doubt that did not otherwise exist. The omission must therefore be evaluated in the context of the entire record.
`If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.' United States v. Agurs, 427 U.S. at 112-13, 96 S.Ct. at 2401."
[4] "Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict. An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial." C.Cr.P. 770.
[5] It should be noted that the sole issue presented by the defense at trial was whether defendant shot Davis in self-defense. Little, if any, mention was made by counsel for the defense as to the possibility that defendant was provoked into shooting Davis because of the beating of his girl friend. The major point of dispute at trial was whether or not Davis had a knife.