# NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2020 KA 0685

STATE OF LOUISIANA

VERSUS

JEROME GRAY

Judgment Rendered: **JUN 1 7 2021**

* * * * * * *

APPEALED FROM THE EIGHTEENTH JUDICIAL DISTRICT COURT,
IN AND FOR THE PARISH OF IBERVILLE
STATE OF LOUISIANA
DOCKET NUMBER 267-16, DIVISION "B"

HONORABLE TONYA LURRY, JUDGE

* * * * * * *

| | |
|---|---|
| Richard J. Ward, Jr. | Attorneys for Appellee |
| District Attorney | State of Louisiana |
| Plaquemine, Louisiana | |
| Terri Russo Lacy | |
| Antonio M. "Tony" Clayton | |
| Assistant District Attorneys | |
| Port Allen, Louisiana | |
| | |
| Jane L. Beebe | Attorney for Defendant/Appellant |
| Addis, Louisiana | Jerome Gray |
| | |
| Jerome Gray | In Proper Person |
| Angola, Louisiana | |

BEFORE: **McDONALD, HOLDRIDGE, and PENZATO, JJ.**

**McDonald, J.**

The State of Louisiana charged the defendant, Jerome A. Gray, by an amended grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1 (count one), and possession of a firearm or carrying a concealed weapon by a convicted felon, a violation of La. R.S. 14:95.1 (count two). He pled not guilty. After a trial by jury, he was found guilty as charged on both counts. The defendant was sentenced on count one to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. On count two, he was sentenced to twenty years imprisonment at hard labor, to run concurrent to the sentence imposed on count one. The defendant now appeals, challenging the sufficiency of the evidence and the denial of his motion for mistrial in a counseled brief and the amendment of the grand jury indictment in a pro se brief. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On November 26, 2015, officers of the Plaquemine Police Department (PPD) received a call reporting that someone had been shot in a part of Plaquemine, Louisiana, known as the Fort area.[1] Responding officers, including Sergeant Detective John Little, found the victim, identified as Derrick Askins, lying on the ground in a field. Acadian Ambulance arrived on the scene and pronounced the victim deceased. A .40 caliber bullet casing ejected from a semi-automatic firearm was located at the scene. The victim was shot once, and the entry wound was located underneath his left shoulder. The bullet traveled through the victim's body, causing an exit wound on the right side of his chest. The victim did not have any defensive marks on his hands.

---

[1] Based on testimony presented at trial, the Fort area consists of Engolio Street, Canal Street, and Church Street in Plaquemine, and the crime scene was included in that area.

2

After canvasing the scene, the officers began gathering names and information from witnesses who were on the scene that night. Based on their investigation, the officers developed the defendant as the suspected shooter and arrested Terry Baker as a suspected principal to the offense. In addition to statements from witnesses at the scene, Crime Stoppers received a phone call regarding the shooting, in which the caller identified the defendant as the shooter.

## COUNSELED ASSIGNMENT OF ERROR NUMBER ONE

In counseled assignment of error number one, the defendant concedes that the identity of the shooter is the only issue in question in this case. He contends that none of the eyewitnesses testified that they told the police at the scene that he was the shooter. The defendant contends that Baker was initially arrested for the offense and challenges Baker's credibility based on Baker's admission that he lied to the police and his inconsistent pretrial statements. The defendant claims that the police eventually decided that he was the shooter based on inconsistent statements from people who were allegedly at the scene and may have only named him "to save their own skins." He further contends the statements were not corroborated by physical evidence, fingerprints, or DNA. He also notes that there was no motive for the shooting and that he and the victim "were presumably friends." The defendant argues that despite the State's attempt to portray his actions after the offense as "flight," none of his actions were indicative of a person who had just shot his friend for no apparent reason. He concludes that the evidence was insufficient to support the requisite elements beyond a reasonable doubt.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the

3

defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Williams**, 2019-0077 (La. App. 1st Cir. 5/31/19), 2019 WL 2315340, *2, writ denied, 2019-01060 (La. 10/1/19), 280 So.3d 158. The **Jackson** standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Vaughn**, 2018-0344 (La. App. 1st Cir. 9/24/18), 259 So.3d 1048, 1058, writ granted in part, judgment reversed in part on other grounds, 2018-01750 (La. 11/25/19), 283 So.3d 494.

Second degree murder is defined in pertinent part as "the killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). The State bears the burden of proving those elements, along with the burden to prove the identity of the defendant as the perpetrator. **State v. Coleman**, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155. When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one

4

witness is sufficient to support a conviction. **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).

Relative to the defendant's felon in possession of a firearm conviction, La. R.S. 14:95.1(A) makes it unlawful for any person who has been convicted of certain felonies to possess a firearm. To prove a violation of La. R.S. 14:95.1, the State must prove: (1) the defendant's status as a convicted felon; and (2) that the defendant was in possession of a firearm. **State v. Loper**, 2010-0582 (La. App. 1st Cir. 10/29/10), 48 So.3d 1263, 1266. The State must also prove that ten years have not elapsed since the date of completion of the punishment for the prior felony conviction. See La. R.S. 14:95.1(C). Thus, a violation of La. R.S. 14:95.1 by the defendant required proving no more than that he had a certain prior felony conviction and was in possession of a firearm. See **Loper**, 48 So.3d at 1266. In this case, the defendant does not contest his predicate conviction on appeal and only contests his identification as the shooter.

In cases where the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. **State v. Dorsey**, 2010-0216 (La. 9/7/11), 74 So.3d 603, 633-634, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a

determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **State v. Lavy**, 2013-1025 (La. App. 1st Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. See **Lavy**, 142 So.3d at 1006.

Detective Little testified that the shooting in this case took place on November 26, 2015, Thanksgiving Day, in the Fort area, while the victim was near the home of Cynthia James (also referred to as "I.D.'s house" and "Inee's house"). Detective Little further testified that the ejected .40 caliber bullet casing located at the scene was fired by a Glock Model 22 .40 caliber semi-automatic pistol[2] that fires one round with each single pull of the trigger. It has a magazine that holds fifteen rounds and holds one round in the chamber, so it holds sixteen rounds of .40 caliber ammunition. Detective Little explained that a Glock ejects a casing after being fired, unlike revolvers that have a cylinder in which the casings remain after they are fired.

Although he interviewed several witnesses, including Michael Williams, Felton Henderson, and Baker, Detective Little confirmed that some witnesses did not cooperate because they were afraid for their safety. Detective Little noted that he had known Baker for years at the time of his arrest, as Baker was "always on the street." Baker was arrested as a suspected principal, as the officers initially believed that he set the victim up to be murdered. Thus, Baker was under arrest at the time of his initial statement and did not cooperate at that time. Officers of the PPD began to look for the defendant at different locations, including the residences of his mother and girlfriend and other places that people frequent, but they were

---

[2] The State introduced a semi-automatic Glock Model 22 .40 caliber for demonstrative purposes only, labeled as S-1.

6

unable to locate him. The officers contacted the defendant's cell phone carrier for ping information and sought assistance from the Louisiana Attorney General's Office and U.S. Marshals Service to locate the defendant. A cell phone ping located the defendant's cell phone in New Orleans and officers proceeded to the New Orleans location. However, there was a news media release of their attempt to locate the defendant, informing the public to be on the lookout for him. When the officers arrived at the New Orleans location, the defendant's cell phone ping was lost. Specifically, there was no longer any service going to the phone, indicating that it had been turned off or the battery was dead. On December 3, the U.S. Marshals Service, which had a joint fugitive task force with other federal agencies, located the defendant in Baton Rouge, and he was placed under arrest.

At trial, Williams testified that he grew up in Plaquemine, and he had known the defendant, whom he referred to as "Dusty," for over fifteen years by the time of the trial and was friends with the victim.[3] He further testified that on the day of the shooting, Williams went to his cousin's home for a second Thanksgiving meal after the victim, who was there at the time, told him that the food was ready. Williams and the victim then rode around Plaquemine and later picked up Felton Henderson, who joined them as they continued to ride around. When they arrived in the Fort area, at the James' residence, Williams saw several friends outside "having fun" and decided to stop.

Williams testified that they were at the residence, "having a good little time," when the defendant and Baker pulled up. Williams noted that the defendant and Baker "looked like they were high." He explained that their eyes were puffy and that they "[l]ooked like they were up to no good." At one point, the defendant

---

[3] Several of the witnesses identified and referred to the defendant by his nickname "Dusty" during testimony. To be consistent, we refer to him as "the defendant."

called Baker across the street, to where Williams's truck was parked on the sidewalk. Williams testified that he "felt something wasn't right[,]" as he observed the defendant and Baker talking. Just as the defendant walked away, Baker called the victim over. Williams walked toward Baker with the victim and members of the crowd followed. Then, "[o]ut of the blue," the defendant came back, ran towards the crowd, and swung at the victim.

The defendant did not hit the victim, as the victim ducked and smiled at the defendant when he came back up. Williams testified, "Then [the defendant] come up and I ran towards him saying no, no. Then he shot him." Williams further testified that the victim was "shocked" after the first shot. The defendant fired another shot, and when Williams looked around, he did not see the victim. Williams stated that he was "one hundred percent sure" the defendant shot the victim and that he "wouldn't lie on" the defendant. Williams described the gun used by the defendant as a black gun. Williams saw the defendant "cock back" the gun and ran towards the defendant. Williams stated that he was going to push the defendant, but the defendant "shot too fast." Williams further stated, "When he shot, it kinda like shocked me. He shot [the victim] and shot again, and I took off running." He testified that at the time of the shooting, the defendant was wearing a gray hoodie, a black shirt, and blue jeans. Williams denied seeing the victim with a gun or any weapon on him that day.

Williams further testified that after the shooting, about a month and a half to two months before the trial, he had been approached by Daniel Lewis, whom he described as a jailhouse lawyer. According to Williams, Lewis told him that the defendant, who was incarcerated at the time, wanted him to change his statement. Lewis had been in jail with the defendant and had just been released. As to how he felt about the defendant's request, Williams testified, "That's something I wouldn't do. That was my best friend he killed. I wouldn't do that."

On cross-examination, Williams noted that the victim was wearing all black when he was shot and that he did not see him once he fell to the ground. While he assumed that the victim had been shot, he thought the victim may have been able to run away. He then heard Baker stating that the victim was dead and telling someone to call the police. Williams left the scene before the police arrived. He confirmed that he had drank beer and "probably" smoked marijuana ("[p]robably one blunt") earlier that day. He, however, stated that he was not drunk and had "one cup of alcohol and probably about three, four beers." He further said he "wasn't even finished the alcohol when all of this occurred." After the shooting, the next morning, Williams hid from the defendant when he saw him in Plaquemine with a fishing pole. Williams stated he was "thinking that [the defendant] was going to come after me next."

Williams's pretrial audio and video recorded statement, given the day after the shooting, was consistent with his trial testimony. He specifically detailed his actions of the day, noted the moment "out of the blue" when "[the defendant]" swung at the victim, and stated that the victim "dodged the lick." He stated that the defendant almost fell before pulling a gun out of his pocket and firing it. Williams stated that he heard another gunshot as he fled. He saw the victim walking towards a field and thought that he, perhaps, had not been shot. However, he subsequently heard, Baker, who also walked towards the field, state that the victim was dead. When asked why anyone would have shot the victim, Williams explained that the victim had been shot in the leg in an unrelated incident in 2013 and had identified the shooter in that incident. According to Williams, the shooter in the unrelated incident was arrested but later killed. The victim was viewed as having "ratted" on the other shooter, and the victim's life was being threatened as a result. Williams was unaware of any other reason that someone may have had to hurt the victim.

Lewis, the defendant's friend, testified that he made up his mind "rather slowly" to testify. He confirmed that the defendant was his "buddy" and they served time together in jail. Lewis further confirmed that the defendant asked him to speak to Williams on his behalf. While he also confirmed that he approached Williams as requested by the defendant, he denied telling Williams to change his testimony. He testified, "That is false. I asked Mr. Michael Williams if he had made an accurate testimony or was he drunk when he made it, and he said he was sure about what he had said." After he was asked if he wanted Williams to say that he was drunk, Lewis noted that such an admission would have at least led to some doubt regarding Williams's testimony. Lewis further confirmed that he provided the defendant with legal assistance regarding the instant case and that the defendant specifically asked him to talk to Williams to find out if Williams was drunk when he made his prior statement.

At trial, Baker described the defendant as a close friend and noted, "I love him."[4] Baker also admitted that he did not want to testify and that he "told a lot of lies" prior to trial. Baker admitted being present at the Thanksgiving gathering on the day in question. He noted that he was standing in someone's yard on Canal Street when the defendant walked up to him, put his arm around him, and stated, "General,[5] let me talk to you." As they walked across the street talking, the victim and some other "fellas" approached and they "dapped each other." He added, "For whatever reason, [the victim] came up, he [the defendant] swung at [the victim]." Baker further testified that in response to the defendant taking a swing at him, the victim asked in part, "what the hell you doing, man, what [sic] I did you[?]" Baker added, "So, he walked off, back on the end. He [the defendant]

---

[4] Baker also referred to the defendant as "Dusty."

[5] The defendant referred to Baker by his nickname, "General." Baker also noted that they called the victim "Dizzy."

pulled out a gun and clicked it and shot over that way." Baker confirmed that it was the defendant who pulled out a gun and fired it, that he was telling the truth, and that he saw the shooting, stating, "Yes, I was standing there." He further confirmed that Detective Little arrested him as a "Principal" to murder after the shooting, and that he was upset with Detective Little about his arrest.

When asked about his ultimate decision to testify despite his reluctancy, he testified, "I like to clear my conscience, man. 'Cause I done had love for him and [the victim]. Both of them stayed at my house many of times. . . . I been knowing them. We've been friends, you know." He added, "But anyway, I kind of feel like, that lady there, they from the Fort. He's from the Fort. That's the neighborhood I live in. I just can't keep that in no more, man. I feel for her too. This man dead. He gone, man." Baker confirmed that he was also approached by Lewis before the trial and that they talked about the case. On cross-examination, Baker testified that he previously lied because he wanted to protect the defendant.

On December 1, 2015, Baker provided a pretrial recorded statement in which he provided details of the shooting consistent with his trial testimony. Baker[6] stated that he had known the victim since the victim was a kid. As to the moments before the shooting, Baker stated that the defendant, his "other friend" punched the victim ("or missed him"), pulled out his black gun, and shot the victim. Baker demonstrated the defendant's actions with the gun and noted that the gun made clicking noises ("click-click") before the defendant fired it. Baker stated that after the defendant shot the victim, the defendant stated, "Ain't [sic] nobody saw a mother-f****** thing either." Baker stated that he perceived the defendant's statement as a threat. He described the victim as humble and scared, and noted that he did not deserve to die. He further noted that he never saw the

---

[6] Baker was sixty-four years old at the time of the trial, significantly older than the defendant who was forty-two at the time of the trial.

11

victim with a weapon and stated that the defendant killed him for no reason, stating that it was "cold blooded murder." Baker stated that the defendant did not give him any indication that he was going to hurt the victim,[7] and just attempted to punch him without any reason. He described the defendant as a violent person who picked on "weaker dudes."

Henderson testified that he was with the victim when the victim was shot on Thanksgiving Day 2015.[8] He identified the defendant in court as the shooter and confirmed that he saw the shooting. He also confirmed that he saw the defendant swing at the victim before shooting him. He denied that the victim had a gun or any other kind of weapon or did anything to cause the defendant to shoot him. Henderson confirmed that it was dark outside at the time, but that he saw the shooting in the dark and described the gun as being black. He confirmed that he and Williams left the scene together after the shooting and did not call the police. Henderson did not know the defendant before the shooting but had seen him on the streets before the shooting and knew him as "Dusty."

Consistent with his trial testimony, in his recorded pretrial interview given the day after the shooting, Henderson confirmed that he saw Baker and the defendant standing near Williams's truck before the defendant busted through the crowd, swung at the victim, and then started shooting. He stated that the defendant shot at the victim three times but denied seeing the victim get hit and saw the victim take off. Williams told him that "[the victim] got killed" and stated, "Come on, let's go." Henderson confirmed that he voluntarily came to the police to make a statement about his observations of the shooting.

---

[7] Baker indicated that the defendant made derogatory comments about an unrelated person and incident before approaching the victim.

[8] Henderson also referred to the victim as "Dizzy."

According to Dr. Michael Defatta, who reviewed the victim's autopsy report and testified at trial as an expert in forensic pathology, the victim had his side turned to the gun or the shooter based on the trajectory of the bullet and may have been running or ducking. He noted that the victim's heart would have been able to pump blood after the shooting to allow him to run, noting that it is not uncommon for some people to be able to walk as far as 100 feet after such a gunshot to the heart. Dr. Defatta confirmed that the cause of death was the gunshot wound to the left chest.

Herein, the jury heard the testimony of all the witness and saw the pretrial interviews. The jury further heard Baker's explanation for not initially being forthcoming. The eyewitnesses consistently described the moments leading to the shooting and all unequivocally identified the defendant as the shooter. We further note that courts have long recognized that "[e]vidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt. This rule applies notwithstanding that the evidence may disclose another crime." **State v. Davies**, 350 So.2d 586, 588 (La. 1977); see also **State v. Newberry**, 2016-0147 (La. App. 1st Cir. 9/16/16), 2016 WL 4942429, at *9 (observing that "'[f]light' comprehends continued concealment to avoid arrest and prosecution as well as the act of leaving the jurisdiction" and that "the jury may consider evidence of flight from the scene of the crime whether or not law enforcement personnel are involved."). Moreover, actions by a defendant that are designed to influence the testimony of witnesses or prevent witnesses from testifying give rise to an inference that he acted from an awareness or consciousness of his own guilt. See **State v. Burnette**, 353 So.2d 989, 992 (La. 1977); see also **State v. Johnson**, 426 So.2d 95, 102 (La. 1983); **State v. Williams**, 2016-0519 (La. App. 1st Cir.

9/15/17), 2017 WL 4082077, at *5, writ granted in part on other grounds, 2017-1753 (La. 6/15/18), 245 So.3d 1042 (per curiam).

The verdict rendered in this case indicates that the jury rejected the defendant's theory that the eyewitnesses to the shooting misidentified him as the person who shot the victim. See **State v. Brothers**, 2017-0870 (La. App. 1st Cir. 11/1/17), 233 So.3d 110, 116, writ denied, 2017-2160 (La. 10/8/18), 253 So.3d 803 (finding the evidence sufficient to support the second degree murder conviction, despite key witnesses recanting their statements at trial, because the witnesses' original statements positively identified the defendant as the shooter). In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See **Ordodi**, 946 So.2d at 662. Considering the consistent eyewitness testimony and police statements presented at trial, the jury could have rationally concluded that the defendant was the shooter in this case.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder, the defendant's identity as the perpetrator, and

all of the elements of possession of a firearm or carrying a concealed weapon by a convicted felon. Thus, counseled assignment of error number one lacks merit.

## COUNSELED ASSIGNMENT OF ERROR NUMBER TWO

In counseled assignment of error number two, the defendant argues that the trial court erred in denying his motion for mistrial after the State revealed during its opening statement specific details of the defendant's predicate offense. He contends the State should have revealed only the existence and timing of his prior second degree battery conviction, the predicate used to charge him as a convicted felon in possession of a firearm, but instead, revealed the specific facts of the offense. He argues that once the jury heard the details of the other crime and its similarity to some of the facts alleged in this case, the jury's ability to fairly assess the evidence and his ability to mount a defense were prejudiced. He contends the State was allowed to portray him as a bad person who acted in conformity with the actions to which he pled no contest just months before the instant alleged offense. He asserts that the introduction of the evidence was not harmless since the jury's verdict cannot be considered "unattributable" to the error.

The primary function of the prosecutor's opening statement is to set forth, in general terms, the nature of the charge sufficiently to enable the jury to follow the proceedings and to inform the accused of what acts on his part the State intends to prove. See La. Code Crim. P. art. 766. Statements made outside the permissible scope of an opening statement may result in a mistrial under La. Code Crim. P. arts. 770 and 771. **State v. Banks**, 2009-0052 (La. App. 1st Cir. 6/12/09), 2009 WL 1655006, at *2, writ denied, 2009-1609 (La. 3/12/10), 28 So.3d 1024. Article 770 provides in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

* * *

(2) Another crime committed or alleged to have been committed by the defendant *as to which evidence is not admissible*;

(Emphasis added.)

Otherwise, an admonition to the jury may suffice, as provided in Article 771:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

***

> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

Mistrial is a drastic remedy and warranted only when substantial prejudice will otherwise result to the accused to deprive him of a fair trial. **State v. Booker**, 2002-1269 (La. App. 1st Cir. 2/14/03), 839 So.2d 455, 467, writ denied, 2003-1145 (La. 10/31/03), 857 So.2d 476. A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion. **State v. Givens**, 99-3518 (La. 1/17/01), 776 So.2d 443, 454. Before a verdict will be overturned on the basis of improper argument, the court must be thoroughly convinced that the comment influenced the jury and contributed to the verdict. In determining whether improper argument has contributed to the verdict, a reviewing court should give credit to the good sense and fairmindedness of the jurors who have heard the evidence. **State v. Thompson**, 2016-1348 (La. App. 1st Cir. 5/2/17), 2017 WL 1755594, at *7, writ denied, 2017-1199 (La. 5/11/18), 241 So.3d 1011.

In the instant case, during opening remarks, the State, in pertinent part, stated as follows,

Now, I start with the road map to what you are going to hear in this case. And this road map will lead you to a conviction of both charges with him. I'll start off with him with a felon in possession of a firearm. He was convicted of two counts of second degree battery and that's where he took his fist and busted a head open and punched - -

The defense attorney interjected to request a bench conference and argued that the State was only allowed to say that the defendant was convicted. In response, the State noted that it intended to present testimony regarding the facts of the predicate offense. The trial court noted that it would research whether the State would be allowed to present such facts and the State proceeded with opening remarks. The State then, by way of an analogy to the facts of the instant case, mentioned the predicate offense again as follows, "...and I told you about the second degree battery charge is a felony – for some inexplicable reason he runs up to and he just (demonstrating), and he punches at [the victim]."

Later, when the trial court disclosed that it was unable find any cases to support allowing the facts of the predicate offense to be presented to the jury, the defense attorney moved for a mistrial, based on the State's comments during its opening statement, noting that the State mentioned the predicate offense a second time even after the initial objection. The defense attorney argued that the defendant was prejudiced by the admission of the facts of the second degree battery offense and noted that the State "combined facts" from the previous conviction to indicate the defendant could have done the same in the instant case. The State noted that the jury would be instructed that the underlying felony was not to be considered to be a part of the instant case. The trial court stated that the parties would be allowed to research the issue. After noting that giving the facts of the predicate offense would be prejudicial, the trial court added, "But it was so brief when you talked about it that I think I can admonish the jury to disregard any facts about the conviction and the conviction can only be used for the felon in

possession without declaring a mistrial." After the bench conference, the State resumed questioning Detective Little and the defense attorney did not request an admonition.

Initially, we note that in his brief, the defendant states, "[t]he trial court should have stemmed the damage by giving a specific and immediate admonishment as requested or granting the motion for new trial." However, the record reflects that the defendant did not request an admonition, when offered by the trial court or thereafter, or subsequently move for a new trial. Additionally, we agree with the trial court's ruling, as a mistrial was not mandated by Article 770 or warranted under Article 771 in this case.

While the statements by the prosecutor at issue herein may be construed as remarks or comments on inadmissible evidence of other crimes, the remarks also could be construed as the State referencing an offense that constituted an element of one of the offenses for which the defendant stood trial, being a convicted felon in possession of a firearm. Furthermore, prior to the opening remarks, the trial court instructed the jury that the opening statement by the State is not evidence and that statements made by attorneys at any time during the trial are not evidence. During jury instructions before deliberations, the trial court reiterated that statements made by attorneys are not evidence. The trial court further specifically reminded the jury that opening statements were permitted solely to tell the jury the facts the State expected to prove and are not to be considered evidence. We, moreover, are not convinced that the passing references at issue contributed to the verdicts. See **State v. Guidry**, 2019-1624 (La. App. 1st Cir. 10/21/20), ___ So.3d ___, ___, 2020 WL 6156698, at *6-7 (in which the prosecutor's hyperbolic and improper reference to the possibility of the defendant committing another crime was found not to have contributed to the jury's finding of guilt and was deemed harmless error). We find no error or abuse of discretion in the trial court's denial

18

of the defendant's motion for mistrial. See **State v. Joyner**, 50,740 (La. App. 2d Cir. 6/22/16), 197 So.3d 724, 735-37, writ denied, 2016-1493 (La. 6/16/17), 219 So.3d 1111 (wherein the prosecutor referred during its opening statement to evidence that was ultimately not admitted, and the court found[9] the defendant failed to prove the prosecutor's statements rose to the level of "bad faith" or "clear and substantial prejudice" and further found that the statements were not so prejudicial as to merit a mistrial). Counseled assignment of error number two lacks merit.

## PRO SE ASSIGNMENT OF ERROR

In the sole pro se assignment of error, the defendant argues that the amendment of the indictment three years after it was returned by the grand jury to add count two, possession of a firearm or carrying a concealed weapon by a convicted felon, constituted a constructive amendment in violation of the Fifth Amendment of the United States Constitution. Relying on the argument that his constitutional right was violated, the defendant contends that the lack of a contemporaneous objection should be disregarded. The defendant contends that he had insufficient notice of the new charge against him and was deprived of presenting a proper defense thereto. The defendant further argues that the indictment is fatally defective on its face in that no filing date or signature of the grand jury foreman appears on the indictment. He concludes, "his conviction is unauthorized in that the record fails to disclose a valid indictment."

Under Louisiana law, prosecution for a capital offense or an offense punishable by life imprisonment shall be instituted by indictment by the grand jury, and prosecution of other felony offenses shall be initiated by indictment or information. La. Const. art. I, § 15; La. Code Crim. P. art. 382(A). An indictment

---

[9] The court cited **State v. Green**, 343 So.2d 149, 151 (La. 1977), to note the general rule that, "absent bad faith on the part of the prosecutor or clear and substantial prejudice, the reference in the opening statement to evidence later ruled inadmissible is not a ground for a mistrial."

is a written accusation of crime made by a grand jury that must be concurred in by not less than nine grand jurors, indorsed a "true bill," and the indorsement must be signed by the foreman. La. Code Crim. P. art. 383. **State v. Brazell**, 2017-0032 (La. App. 4th Cir. 4/18/18), 245 So.3d 15, 29, writ denied, 2018-0868 (La. 3/6/19), 266 So.3d 900, cert. denied, ___ U.S. ___, 140 S.Ct. 263, 205 L.Ed.2d 167 (2019). Under La. Code Crim. P. art. 487, the court may at any time cause the indictment to be amended in respect to a formal defect and may order an indictment amended with respect to a defect of substance at any time before the trial begins. Such amendments may include adding a charge or a count to an indictment. **State v. Sanders**, 93-0001 (La. 11/30/94), 648 So.2d 1272, 1283, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); **State v. Pitree**, 2005-1513 (La. App. 3d Cir. 5/3/06), 930 So.2d 265, 280, writ denied, 2006-1897 (La. 3/23/07), 951 So.2d 1092.

Likewise, it is well-settled law that district attorneys are empowered to amend indictments, both as to form and substance, at any time before trial. See La. Code Crim. P. art. 487(A); **State v. Charles**, 2019-0757 (La. App. 1st Cir. 8/19/19), 2019 WL 3891818, at *1, writ denied, 2019-01615 (La. 7/24/20), 299 So.3d 49; **State v. Frost**, 53,312 (La. App. 2d Cir. 3/4/20), 293 So.3d 708, 720, writ denied, 2020-00628 (La. 11/18/20), 304 So.3d 416. The purpose of requiring the State to file an amendment to an indictment before trial is to provide the defendant with adequate notice of the crime for which he is charged so he can properly prepare his defense. When the indictment against the defendant provides sufficient notice of the crime with which he is charged, a defendant suffers no prejudice. **State v. Delandro**, 2001-2514 (La. App. 1st Cir. 5/10/02), 818 So.2d 1011, 1017. The time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 623,

cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. **State v. Thibodeaux**, 98-1673 (La. 9/8/99), 750 So.2d 916, 930, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000); **State v. Young**, 2019-0773 (La. App. 1st Cir. 8/19/19), 2019 WL 3891091, at *1.

As the defendant concedes, he did not object to the amendment of the grand jury indictment. On February 13, 2019, the State filed a motion to amend the indictment, to add the charge of felon in possession of a firearm (count two), arising out of the same incident.[10] The State attached to the motion an "AMENDED BILL OF INDICTMENT" that is not dated or signed by the foreman. However, on August 14, 2019, the State made a handwritten amendment to the original grand jury indictment to add count two, and the amended indictment was filed in open court. The amended indictment contains the original and the post-amendment filing dates. The defendant was arraigned on count two and pled not guilty. While the defendant did not object to the amendment of the indictment, defense counsel indicated that a motion to sever would be filed to allow the defense to prepare for the additional charge. However, on the next hearing date, September 20, 2019, the defense attorney informed the court that the defendant no

---

[10] In pertinent part, a conviction of felon in possession of a firearm provides for imprisonment "at hard labor for not less than five nor more than twenty years." La. R.S. 14:95.1(B). While a prosecution for an offense punishable by death or life imprisonment must be instituted by a grand jury indictment, all other prosecutions can be instituted by a bill of information. See La. Code Crim. P. art. 382(A). A bill of information made by the district attorney must be filed in open court or in the office of the clerk. La. Code Crim. P. art. 384. In **State v. Smith**, 35,699 (La. App. 2d Cir. 4/5/02), 815 So.2d 412, 414, writ denied, 2002-1502 (La. 4/4/03), 840 So.2d 1200, the defendant was originally charged by grand jury indictment with one count of aggravated rape. The prosecutor later amended the indictment, without approval of the grand jury, to add a count of molestation of a juvenile relative to the victim of the original aggravated rape charge and two counts of aggravated rape relative to two new victims. **Id.** On appeal, the court found the amended indictment should have been quashed with respect to the two new aggravated rape counts, but the court affirmed the defendant's conviction of the added molestation of a juvenile count. See **Smith**, 815 So.2d at 418 and 421. As further recognized in a concurrence to the opinion, the State can "add to an indictment any related charge against the same defendant, so long as the added charge may be initiated by a bill of information." **Smith**, 815 So.2d at 423 (Drew, J., concurring).

longer wished to file a motion to sever and that said motion would not be filed.[11] Two months later, on November 19, 2019, the trial began.

Louisiana Code of Criminal Procedure article 841(A) provides, in pertinent part, that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." The defendant's failure to object to the amendment of the indictment, request a continuance, or move to quash the indictment precludes relief on this claim. See **Draughn**, 950 So.2d at 623; see also **State v. Dean**, 2010-1020 (La. App. 1st Cir. 12/22/10), 2010 WL 5442005, *8, writ denied, 2012-0011 (La. 8/22/12), 97 So.3d 355. Moreover, the defendant has failed to prove any prejudice flowing from the amendment at issue. We find that the State amended the indictment before trial in conformity with Article 487. See also La. Code Crim. P. arts. 489 & 761. The sole pro se assignment of error lacks merit.

## PATENT SENTENCING ERROR

Pursuant to Louisiana Code of Criminal Procedure article 920, this court routinely conducts a review for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. After a careful review of the record, we have found a sentencing error. Louisiana Revised Statute 14:95.1(B) mandates imposition of a fine of not less than $1,000, nor more than $5,000. The defendant's sentence does not include a fine. Because the sentence imposed on count two does not comply with Section 14:95.1(B), it is illegally

---

[11] We also note that the defendant did not file a motion to continue based on the amendment of the indictment. Instead, he filed a "MOTION FOR PRELIMINARY EXAMINATION, ALTERNATIVELY FOR BAIL AND FOR SPEEDY TRIAL" on August 26, 2019, wherein he included a request for a speedy trial with respect to the felon in possession of a firearm charge. He also filed a separate "MOTION FOR SPEEDY TRIAL" on the same date with respect to the second degree murder charge. At the September 20, 2019 hearing, however, the defendant declared that his speedy trial request was only for the second degree murder charge and did not relate to the felon in possession of a firearm charge.

lenient.[12] However, since the sentence is not inherently prejudicial to the defendant, and neither the State nor the defendant has raised this sentencing issue on appeal, we decline to correct this error. See **State v. Price**, 2005-2514 (La. App. 1st Cir. 12/28/06), 952 So.2d 112, 124-25 (en banc), writ denied, 2007-0130 (La. 2/22/08), 976 So.2d 1277.

**CONVICTIONS AND SENTENCES AFFIRMED.**

---

[12] We further note that when imposing the sentence on count two, the trial court did not state that the sentence would be served without the benefit of parole, as statutorily required. See La. R.S. 14:95.1(B). Nonetheless, as La. R.S. 15:301.1(A) provides, any applicable "without benefits" provision is self-activating. **State v. Williams**, 2000-1725 (La. 11/28/01), 800 So.2d 790, 799.